[No. 28146. *En Banc.* February 25, 1941.]

*In the Matter of the Eligibility of the Persons Employed at the* ST. PAUL AND TACOMA LUMBER COMPANY.[1]

[1]Reported in 110 P. (2d) 877.

*The Attorney General* and *Lyle L. Iverson, Assistant,* for appellant Commissioner of Unemployment Compensation.

*James J. Molthan,* for appellants Forsythe *et al.*

*Grosscup, Morrow & Ambler,* for appellant St. Paul and Tacoma Lumber Company.

*Stevenson & Gershon* and *James J. Molthan,* for appellants Kontos *et al.* and respondents Alm *et al.*

*L. B. Sulgrove,* for respondents shingle weavers.

SIMPSON, J.—This case involves unemployment compensation claimed by employees of the St. Paul and Tacoma Lumber Company. The company is engaged in the large scale production of lumber and timber

products, with its manufacturing plant located in the city of Tacoma. The plant included a sawmill, a shingle mill, and private booming and sorting grounds. It had two logging camps located near Kapowsin and Ohop, in Pierce county. The company's employees number approximately twelve hundred men, the largest portion of whom work in the woods and sawmill.

The woods and sawmill groups were members of the Timber Workers' Union, Local 2-9. Twenty-seven men were employed as boomers and rafters and were members of the Boommen and Rafters' Union, Local 129, of the International Woodworkers of America, both of which unions were affiliates of the Congress of Industrial Organization. The shingle mill employed some forty men, all of whom were members of Local 2550 of the Washington-Oregon District Shingle Weavers' Council, an affiliate of the American Federation of Labor. Several men, members of Local 2-9, worked for William B. Forsythe, who had an agreement governing the loading and sale of logs to the St. Paul and Tacoma Lumber Company.

During the month of May, 1939, the members of Local 2-9, I.W.A., who were employed in the woods, went out on strike, and within a few days thereafter the union members employed in the sawmill joined in that strike. Picket lines were then established by the strikers, and all of the company's employees, including those working in the shingle mill, other than a small number holding union permits to go through the picket line, refused to report for work. This resulted in a complete suspension of the company's operations. Thereupon, most of the twelve hundred employees filed claims for benefits under the Washington unemployment act. Chapter 162, Laws of 1937, p. 574, as amended by chapter 214, Laws of 1939, p. 818, Rem. Rev.

Stat. (Sup.), §§ 9998-101 to 9998-124 [P. C. §§ 6233-301 to 6233-323].

The division of unemployment compensation issued initial determinations on the claims, which, in practically all of the cases, held that the claimants were ineligible for benefits by reason of the provisions of the "labor dispute disqualification" section.

Section 3 (e) of the 1939 act, p. 824, Rem. Rev. Stat. (Sup.), § 9998-105 [P. C. § 6233-305] (e), reads as follows:

"For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this sub-section shall not apply if it is shown to the satisfaction of the commissioner that:

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this sub-section, be deemed to be a separate factory, establishment, or other premises."

The claimants, being dissatisfied with the determinations made by the department, appealed therefrom, and their appeals were heard by the appointed appeal tribunal. In each case, the appeal tribunal affirmed the initial or supplemental determination of the department. The decision of the appeal tribunal was reviewed by the commissioner of unemployment compensation,

who affirmed its findings. The claimants then filed notices of appeal in the various counties of their residence; thereafter, the several causes were consolidated for trial in the Pierce county superior court. The trial court rendered a judgment which substantially affirmed the decision of the commissioner of unemployment compensation. The court, however, reversed the decision relative to claimant workers in the shingle mill, as well as to several workers in the power house, boiler room, and electrical jobs, by holding that those claimants were eligible for benefits. The commissioner of unemployment compensation, the St. Paul and Tacoma Lumber Company, the boommen and rafters, the employees of William B. Forsythe, and all other employees of the St. Paul and Tacoma Lumber Company have appealed.

The commissioner of unemployment compensation and the company urge error on the part of the trial court as follows: In revising the findings of fact of the administrative tribunal with respect to the shingle workers; in finding that the shingle workers were entitled to benefits; in holding the maintenance men entitled to benefits; in assuming jurisdiction to review the case of Lewis H. Selover; and in awarding attorneys' fees for claimants. The claimants who have appealed assign error in the denial of benefits to them.

In discussing the various questions presented, we have in mind § 2 of chapter 162, Laws of 1937, p. 574, Rem. Rev. Stat. (Sup.), § 9998-102 [P. C. § 6233-302], which states the purpose of the legislature in passing the unemployment compensation act and the manner in which it shall be construed. That section reads:

"Whereas, economic insecurity due to unemployment is a serious menace to health, morals and welfare of the people of this state; involuntary unemployment is, therefore, a subject of general interest and concern

which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. Social security requires protection against this greatest hazard of our economic life. This can be provided only by application of the insurance principle of sharing the risks, and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing powers and limiting the serious social consequences of poor relief assistance. The State of Washington, therefore, exercising herein its police and sovereign power endeavors by this act to remedy the widespread unemployment situation which now exists and to set up safeguards to prevent its recurrence in years to come. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, and that this act shall be liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby to the minimum."

The first question is whether there was a labor dispute within the meaning of Rem. Rev. Stat. (Sup.), § 9998-105 (e), so as to bring the disqualification clause into operation. The only basis for denying that this was a labor dispute was the fact that the employer and the striking employees had not entered into negotiations for wages, hours, or working conditions. Instead, the union which represented the employees had asked that the employer negotiate a contract with them governing the foregoing matters, and the employer refused to enter into such negotiations. The refusal resulted in the strike vote of local 2-9, I.W.A.

It is conceded that, if there had been an entry into negotiations between the employer and the union rep-

resenting the employees, and if the strike had resulted from an inability upon the two sides to agree on the terms of the proposed agreement, a strike called by the union would have arisen out of a labor dispute. There is no valid reason for holding that there is any less reason for the disqualification where the strike is called due to a refusal on the part of the employer to enter into negotiations. In effect, such a refusal is a denial of all the changes which might be suggested by the union in the proposed negotiations; and when they called a strike in protest against the refusal of the employer, it was motivated by their desire to obtain the changes which were to be proposed in the course of the refused negotiations. As a matter of fact, there is no real distinction between the two situations, and in either event a labor dispute was the cause of the stoppage of work, out of which the unemployment grew.

The next problem is that relating to the shingle mill employees. The commissioner found that the reason for the unemployment of these men was that they refused to go through the picket line established by the striking union. The contention of the individuals in this group was that they were members of a separate union, affiliated with the A. F. of L., while the strikers were members of the C. I. O., and that they were willing to go to work regardless of the presence of the pickets, but were stopped from so doing because the employer had determined to cease the operation of the shingle mill after the woods and sawmill men had gone on strike.

The evidence relative to the reason for the men's failure to return to work is in conflict. There was testimony to the effect that the union had voted not to go through the picket line, and there was other evidence that they had voted to go through that line. There was

testimony which showed that the shingle mill could operate as a separate unit, and testimony to the contrary. Again, there was contradictory evidence presented to the commissioner as to whether or not the shingle mill management intended to operate.

The trial court reversed the commissioner's findings and attributed the shutdown of the shingle mill to the refusal of the company to continue its operations.

■ Before entering into a discussion of whether or not a failure on the part of claimants to go through the picket line established by members of a union to which they do not belong would disqualify them from receiving benefits under the act, we must determine whether the trial court was justified in reversing the commissioner's findings of fact.

The act contains a comprehensive procedure both for the filing of claims for compensation and for appeals by the employee and employer from the determinations of the department. The pertinent portion of the act relative to appeals to the courts is contained in Rem. Rev. Stat. (Sup.), § 9998-106 [ P. C. § 6233-306] (i), which reads:

"Within thirty days after final decision has been communicated to any interested party, such interested party may appeal to the superior court of the county of his residence, and such appeal shall be heard as a case in equity but upon such appeal only such issues of law may be raised as were properly included in his application before the appeal tribunal. The proceedings of every such appeal shall be informal and summary, but full opportunity to be heard upon the issues of law shall be had before judgment is pronounced. . . .

"If the court shall determine that the commissioner has acted within his power and has correctly construed the law, the decision of the commissioner shall be confirmed; otherwise, it shall be reversed and modified. . . .

" . . . In all court proceedings under or pursuant to this act the decision of the commissioner shall be prima facie correct, and the burden of proof shall be upon the party attacking the same." Laws of 1937, chapter 162, p. 582, § 6, as amended by Laws of 1939, chapter 214, p. 825, § 4.

Since the questions relative to the interpretation of this act are of first impression, we have no cases to which we may look for guidance in ascertaining the extent of the power of the court in reviewing the findings of fact made by the commissioner. In construing this statute, we must bear in mind that the legislative intent is the controlling factor and must be ascertained from a consideration of the entire act.

The supreme court of the United States in *Voehl v. Indemnity Ins. Co.*, 288 U. S. 162, 77 L. Ed. 676, 53 S. Ct. 380, 87 A. L. R. 245, construed the longshoremen's and harbor workers' compensation act, 33 U. S. C. A. (Sup.), §§ 901-950. That act, referring to the power and duty of the court in construing an order of the deputy commissioner in passing upon a claim for compensation, provided:

"If the court determines that the order was made and served in accordance with law, and that such employer or his officers or agents have failed to comply therewith, the court shall enforce obedience to the order by writ of injunction or by other proper process, mandatory or otherwise, to enjoin upon such person and his officers and agents compliance with the order." 33 U. S. C. A. (Sup.), § 921 (c).

In discussing the act, Mr. Chief Justice Hughes stated:

"We think that there can be no doubt of the power of the Congress to invest the deputy commissioner, as it has invested him, with authority to determine these questions after proper hearing and upon sufficient evidence. And when the deputy commissioner, following the course prescribed by the statute, makes such a

determination, his findings of fact supported by evidence must be deemed to be conclusive. *Crowell v. Benson*, 285 U. S. 22, 46, 47 [76 L. Ed. 598, 609, 610]; *L'Hote v. Crowell*, 286 U. S. 528 [76 L. Ed. 1270]."

In *State ex rel. Brown v. Board of Dental Examiners*, 38 Wash. 325, 80 Pac. 544, we spoke of the function of the court relative to a statute of this type, and used the following language:

"The general rule is well established that the courts cannot review the discretion which has by law been vested exclusively in inferior tribunals, and mandamus will therefore not lie to compel the performance of acts or duties which necessarily call for the exercise of discretion on the part of the officer or board at whose hands their performance is required; because the state has, as in this instance, determined upon and specified the officers upon whose judgment on the questions submitted to them the state is willing to rely."

In *Taylor v. Industrial Ins. Commission*, 120 Wash. 4, 206 Pac. 973, this court stated:

"Unless we limit the power of interference on the part of the courts with the administration of the industrial insurance act by the body empowered by law to administer it, to a great extent the intent of the law will be defeated."

In *Babic v. Department of Labor & Industries*, 156 Wash. 537, 287 Pac. 32, we considered the appellate provisions of the workmen's compensation act which provided that the court might review the factual findings of the department, which were to be deemed *prima facie* correct, and that the burden of proof should be upon the party attacking the same. In deciding that case, we stated:

"The manifest theory and plan of the workmen's compensation law is to commit its enforcement to the officers of the department who, by training and experience, become acquainted with and give their time and attention to the solution of its peculiar problems, with

as little appeal to the courts as necessary. Among other things in this regard, section 8 of the amendatory act provides that orders of the department of labor and industries shall be served upon the person affected thereby. From such order there is no appeal at once to the courts, but the person aggrieved must, prior to any appeal to the courts, serve upon the director of labor and industries an application for a rehearing before the joint board of the department, consisting of the director of labor and industries, the supervisor of industrial insurance and the supervisor of safety, setting forth in full detail the grounds upon which the applicant considers the award or order is unjust or unlawful, and shall include therein every issue to be considered by the joint board, and must set out a detailed statement of facts upon which such claimant or other person relies in support of his application for a rehearing; thus providing in particular detail for a thorough and complete presentation, investigation and understanding of all claims and demands before the department. Only after an adverse ruling on the part of the joint board, or a rehearing is deemed denied as provided in the act, does an appeal lie to the superior court, where, as already stated, the trial is *de novo;* and, for the purpose of the trial in the superior court, the act directs that a certified copy of the complete record of the department of labor and industries on the claim shall be filed with the clerk of the superior court and become a part of the record in such court. Still further, and in consonance with the administrative features of this act, it is provided, as to the hearing in the superior court, as follows:

" 'If the court shall determine that the department has acted within its power and has correctly construed the law and found the facts, the decision of the department shall be confirmed; otherwise it shall be reversed or modified. In case of a modification or reversal the superior court shall refer the same to the department of labor and industries with an order directing it to proceed in accordance with the findings of the court: . . . ' (Rem. 1927 Sup., § 7697.)

"And finally, in the same section of the amendatory act, it is provided:

" 'In all court proceedings under or pursuant to this act the decision of the department shall be *prima facie* correct, and the burden of proof shall be upon the party attacking the same.' (Rem. 1927 Sup., § 7697.)

"Thus it clearly appears, in our opinion, that the courts exercising their proper functions, of course, must defer largely to the officers of the department in the administration of this law."

Rem. Rev. Stat., § 10449 [P. C. § 5627], which deals with appeals from the findings of the public service commission, reads as follows:

"Whenever the commission has issued or promulgated any order or rule, in any writ of review brought by a public service company to determine the reasonableness of such order or rule, the findings of fact made by the commission shall be prima facie correct, and the burden shall be upon said public service company to establish the order or rule to be unreasonable or unlawful."

In deciding upon the right to reverse the findings of fact of that commission, this court, in *State ex rel. Model Water & Light Co. v. Department of Public Service*, 199 Wash. 24, 90 P. (2d) 243, stated:

"The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy."

In this connection, see *South Chicago Coal & Dock Co. v. Bassett*, 309 U. S. 251, 84 L. Ed. 732, 60 S. Ct. 544.

We have defined the terms "arbitrary and capricious" in the following language:

"These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circum-

stances of the case. Action is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached." *Sweitzer v. Industrial Ins. Commission,* 116 Wash. 398, 199 Pac. 724.

The legislature, in passing this act, was conscious of the provision of the workmen's compensation act, which reads:

" . . . but upon such appeal may raise only such issues of law or fact as were properly included in his application for rehearing, or in the complete record in the department." Rem. Rev. Stat., § 7697 [P. C. § 3488].

and of our decisions interpreting that section. In drafting the act under consideration, it evidently patterned the appeal provisions from that of the workmen's compensation act and with the evident intent of limiting the power of the court in reviewing questions of fact under the new act, because it left out the words "or fact" which are contained in the old act.

Looking to the quoted portion of the act in question relative to appeals taken to the superior court, and having in mind our former decisions relative to statutes of this nature, we are constrained to hold that the administrative determination of the facts is conclusive on the court unless it be wholly without evidential support or wholly dependent upon a question of law, or clearly arbitrary or capricious. It seems certain that the court which tries the case sits as a court of equity with limited powers. The court shall review the issues of law which have been previously raised. The court shall review the power of the commissioner to act. The court shall review the facts only in so far as it is necessary to determine whether the commissioner has acted arbitrarily or capriciously, and whether he applied properly the law to those facts.

594

By virtue of the portion of the act which makes the decision of the director *prima facie* correct and imposes upon the attacking party the burden of proof, there is a presumption that the factual findings of the commissioner are not arbitrary or capricious. This presumption cannot be overcome by showing that there was evidence presented from which an opposite conclusion might have been drawn. It must be shown that there was no room for a difference of opinion and that there was no substantial evidence upon which the finding of the commissioner could have been based. That it was not the intent of the legislature to allow the courts to review the facts *de novo,* is shown by the quoted portion of the act, which provides that, if the court finds that the commissioner has acted "within his power and has correctly construed the law," the court shall confirm his decision. This is a clear expression by the legislature of its intent that the function of the court upon appeal shall be limited, and that the factual findings of the department be left undisturbed unless it could be found that there was no substantial evidence upon which they were based.

This interpretation of the act conforms to the nature of this type of legislation, since the very purpose of unemployment insurance demands that payment of claims should be prompt, so that the unemployed individual may have funds to sustain him until he can secure other employment. To hold otherwise, would mean that workmen, who are in vital need of compensation during unemployment periods, could be kept from collecting their payments because of appeals taken on the basis of findings of fact, appeals involving very small sums of money. Clearly, the legislature did not intend that such should be the case. By providing for appellate procedure within the department itself, it, without doubt, intended that, when the case came to

the superior court, it should be because of legal and jurisdictional matters rather than to resolve conflicts in evidence.

■ In view of the foregoing, the findings by the department to the effect that the only reason for the unemployment of these men was their refusal to pass through the picket line established by the group which called the strike, should not have been reversed, since there was substantial evidence upon which such findings were based and there was no indication that the commissioner acted arbitrarily or capriciously.

■ The next question with which we are confronted, therefore, is whether a refusal by nonstriking workers to pass through the picket line established by another union constitutes "participating in" the labor dispute within the meaning of the act.

It is obvious that such a refusal does constitute participation, since, by so refusing to work, the persons are adding their strength to the cause of the strikers, who are then put in a better bargaining position when the entire plant is shut down than when their branch of it has stopped only a portion of the operations. The refusal to pass through the lines under the circumstances present in the case at bar disqualified the workers. The mere fact that the passage through the picket lines was contrary to their union convictions was not enough to make their refusal involuntary, since they had a legal right to pass the lines if they so desired. Having found that these men participated in the dispute, it is unnecessary to determine whether or not they were of the same class as the strikers or whether the portion of the company's work they were doing was commonly conducted as a separate business.

The trial court sustained the commissioner's findings in denying compensation to the men working as boommen and rafters. The evidence showed that these men

were members of a union other than that which called the strike, although both unions were affiliated with the C. I. O.

It was further shown that ten of these men were told not to return to work until called by the company. Eight of the claimants were told to report to work, but refused so to do on account of the presence of the picket line established by the striking union, as explained heretofore. By refusing to pass through the picket lines, the eight men who were to report to work became participants in the dispute, and the other men, being engaged in the same work as that of the men who refused to pass through the lines, came within the operation of Rem. Rev. Stat. (Sup.), § 9998-105 (e), which disqualifies persons who are of the same class or grade of workers as those who are participating in the labor dispute.

Certain of the employees who worked in the electrical shop and boiler room, known as maintenance men, continued their work for some time after the strike started and were allowed to go through the picket lines because they had permits so to do from the striking union. All of these men were members of the union which called the strike. After these individuals had worked a short time, the mill found that it did not have enough wood fuel on hand to keep up steam, and was compelled to resort to the use of oil for that purpose. This necessitated a smaller force and some of the maintenance men were told not to return to work because there was nothing for them to do.

The commissioner decided that those men who were thus deprived of work were not entitled to compensation for the reason that they were directly engaged in the strike activities. The trial court reversed that finding.

In passing, it might be noted that the mere fact that

these individuals saw fit to get permits from the union during the strike period showed that they recognized the existence of the strike. There was no reason for distinguishing them from the other members of the striking union, and they should have been disqualified. Even though the management was compelled to discharge these men, still that act on the part of the employer was due to the fact that the strike reduced the work which could have been given to them, and their unemployment was due to the labor dispute which they, as members of the union, supported.

Ten of these maintenance men, according to counsel's brief, had still an additional reason for receiving compensation, in that they had originally received favorable determinations and had received payments thereunder. Upon examining the records of these ten men, whose names were Arthur C. Hart, John Klippert, Harry Rosenow, Albert Thayne, Walter L. Bundy, Louis A. Estabrook, Robert Farmer, Henry Brungard, Lewis H. Selover, and Chris Schilling, we find that only one of them, Chris Schilling, was properly entitled to compensation. As to all of the others, the trial court erred in reversing the conclusions of the department commissioner.

The departmental records showed that employee Bundy's initial determination had been to the effect that he was ineligible because of a labor dispute, so there is no possible reason for distinguishing him from the others in his class. As for Hart, although the departmental records showed that his initial determination had been favorable, he testified that his copy had been marked "Ineligible," and this testimony was substantiated by the fact that he took an appeal from his initial determination, which is a thing he certainly would not have done if the determination had been favorable to him. It is easy to understand how one of

the departmental employees could have overlooked stamping the office .copy of the determination "Ineligible," in view of the extremely large number of slips which had to be rushed through the office at the time this strike took place. As for Selover, he failed to file a timely appeal from the decision of the department commissioner, and, in fact, the trial court granted a motion to strike his name from the case before the trial. The inclusion of his name by the court among those entitled to compensation was erroneous.

Klippert, Rosenow, Thayne, Estabrook, Farmer, and Brungard, however, received initial determinations of eligibility, but their determination slips were marked "Investigate re Labor Dispute." Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306] (b), negatives the position of these claimants, inasmuch as it reads, in part, as follows:

"If subsequent to such initial determination, benefits with respect to any week for which a claim has been filed are denied for reasons other than matters included in the initial determination, the claimant shall be promptly notified of the denial and the reasons therefor, and may appeal therefrom in accordance with the procedure herein described for appeals from initial determination."

Inasmuch as there was a reservation of the question presented by the labor dispute situation in the initial determinations of these six men, the section just quoted sustains the right of the department to issue supplemental determinations predicated on the conclusions subsequently reached concerning the reserved question.

As we have previously indicated, the only one of this group who properly was held entitled to compensation by the trial court was Schilling. His initial determination was favorable, and his employer was so notified on June 22nd. There was no reservation of the

labor dispute question. The employer did not appeal until July 5th, Schilling having been notified of his determination on July 3rd. The appeal of the employer, subsequently dropped when the department advised it that a supplemental determination reversing the initial determination of eligibility had taken place, was not timely taken, since Rem. Rev. Stat. (Sup.), § 9998-106 (b), indicates that appeals from initial determinations must be taken within five days after notice thereof is received by the person appealing. Hence, since the notice was first received by the employer on June 22nd, the appeal taken on July 5th was not timely.

The trial court affirmed the decision of the commissioner relative to the employees of William B. Forsythe, an independent contractor. These men were members of Local 2-9, the striking union, and the only basis for holding differently than in the other cases would be the fact that their employer was an independent contractor, rather than the St. Paul and Tacoma Lumber Company. The work in which they were engaged was the same as that being done by the company's employees and was performed on the company's land. Although they were not shown to have been called out on strike, the fact is that not one of them worked after the strike was called without first getting a permit of the union so to do. There was no reason for distinguishing the Forsythe employees, in view of their union affiliation and of the following section of the act:

"(e) . . . Whenever any employing unit contracts with or has under it any contractor or sub-contractor for any work which is part of its usual trade, occupation, profession or business unless the employing unit as well as each such contractor or sub-contractor is an employer by reason of section 19 (f) or section 8 (c) of this act, the employing unit shall for all the purposes of this act be deemed to employ each individual

in the employ of each such contractor or sub-contractor for each day during which such individual is engaged in performing such work; . . . . Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this act, whether such individual was hired or paid directly by such employing unit or by such agent or employee: . . . ." Rem. Rev. Stat. (Sup.), § 9998-119a [P. C. § 6233-317] (Laws of 1939, chapter 214, p. 853, § 16).

The foregoing section shows that, for the purpose of the act, these men were employees of the lumber company and were therefore members of the group which called the strike. Clearly, they were within the disqualification clause.

■ An employee named Louis Kontos claims that the commissioner and the court erred in denying him compensation. The evidence regarding this claimant was to the effect that the reason for his not having returned to work was because he heard that there was a picket line established by Local 2-9. He was a member of a different C. I. O. union and testified that he didn't return to work because he wouldn't pass through the picket line. The only fact which differentiates his case from that of others who participated in refusing to pass the picket line, was the fact that, subsequent to the time of the strike, he obtained a job for a short time with the Ozette Timber Company. However, no application for compensation was made after the employment with the Ozette Timber Company, and the question of whether or not such an application would entitle him to compensation was not before the commissioner nor the trial court. The application he made was with reference to unemployment due to the labor dispute in the St. Paul and Tacoma Lumber Company plant; and

since he participated in that dispute by refusing to pass through the picket line, he was ineligible.

█ The court allowed attorneys' fees, payable out of the unemployment compensation administration fund, to those claimants who prevailed in the superior court. The allowance was made in compliance with the provisions of subd. (i) of Rem. Rev. Stat. (Sup.), § 9998-106, which provides that, if the decision of the commissioner shall be reversed and modified, a reasonable attorney's fee, fixed by the court, shall be payable out of the fund.

With our disposition of the case, it is obvious that attorney's fees cannot be allowed out of the fund for any of the claimants except Schilling, whose claim was the only one which was improperly denied by the commissioner.

The judgment is reversed, with instructions to fix a reasonable amount as attorney's fee for the case of Chris Schilling, and to enter a decree in conformity with this opinion.

MAIN, BEALS, STEINERT, BLAKE, DRIVER, and JEFFERS, JJ., concur.

ROBINSON, C. J. (concurring)—The above opinion, expressing the tentative decision arrived at by the majority of the court after hearing oral argument in January, was filed in my office on February 6th. On February 7th, the Associated Press reported that two decisions had that day been handed down by the supreme court of California which, according to the report, dealt largely with similar questions and apparently in much the same way. An immediate decision of this case is so earnestly requested by the administrators of the unemployment compensation act that we have concluded to file our opinion as originally written and without awaiting the text of the California opinions above

mentioned. We understand that the captions of these still unreported cases are, *Bodinson Manufacturing Co. v. California Employment Commission* and *Abellera v. District Court.*

MILLARD, J. (dissenting)—I accept as conclusive the finding by the commissioner that the reason for the unemployment of certain employees "was that they refused to go through the picket line established by the striking union." That finding does not, however, sustain the decision of the commissioner that such refusal constitutes "participating in" the labor dispute within the meaning of the unemployment compensation statute (Rem. Rev. Stat. (Sup.), § 9998-105 (e)).

I am aware of the decision of the supreme court of California, which the Associated Press announced three days ago (February 7, 1941), to the effect "that employes out of work because of voluntary refusal to pass strike picket lines are not entitled to unemployment compensation."

If that authority or precedent be invoked—*Quod exemplo fit, id etiam jure fieri putant*—to buttress the position of the majority of this court, it is a sufficient and logical answer to observe that to require men to do that which would tend to cause a riot and probably result in serious injury to, or loss of life of, those in the picket line and those who endeavored to break through such line, as a condition precedent to unemployment compensation, is an exaction so oppressive as to invalidate the statute in so far as the imposition of the penalty is concerned.

In addition to the logic of the position of the minority, a precedent to support that position is available, an opinion of this court. In *In re Deming*, 192 Wash. 190, 73 P. (2d) 764, we held that a statute which exacted a ten per cent penalty in the event of the failure of a

guardian to render a verified account at least once in every two years, and whenever cited to do so, was invalid in so far as the imposition of the penalty of ten per cent was concerned. We said:

"Careful consideration of the statute now under discussion, in the light of the authorities, convinces us that the provision thereof purporting to impose a ten per cent penalty for failure to file a verified account within the time limited by law is arbitrary, unjust and discriminatory, is not based upon any reasonable theory of compensation, and that the same is consequently void as amounting to taking property without due process of law."

To require men to commit assault and battery, violate criminal statutes, jeopardize their limbs and lives as a prerequisite to unemployment compensation, can not reasonably be deemed less oppressive than the ten per cent penalty provision of the statute invalidated in *In re Deming, supra.*