[No. 30649. Department One. October 29, 1948.]

HOWARD STRAUB, *Respondent*, v. THE DEPARTMENT OF
PUBLIC WELFARE, *Appellant*.[1]

[1]Reported in 198 P. (2d) 817.

*The Attorney General, Boris B. Kramer* and *Jane Dowdle, Assistants,* for appellant.

*Dow & Leahy,* for respondent.

STEINERT, J.—This case involves the amount of financial assistance to be allowed to a recipient of state aid under the legislative program making provision for the needy blind. The matter comes to this court on appeal by the department of public welfare from a judgment of the superior court for Chelan county, wherein the court reinstated, with certain modifications, a prior order of the department determining the amount of assistance to be granted to the recipient blind person. The effect of such order of reinstatement was to reverse an existing order of the department which reduced the amount of recipient's original grant from $186 to $131 per month.

The facts are undisputed. Howard Straub, the recipient and respondent herein, is totally blind and, according to the medical testimony in the case, is completely paralyzed and is also suffering from a "pyelogenic infection of his kidneys." For a number of years past, he has been receiving public assistance from the state of Washington under provisions

of the law relating to the needy blind. Prior to May 1, 1947, this financial assistance, which the department of public welfare had granted and regularly paid to him, amounted to $186 a month. This amount covered allowances for food, clothing, personal incidentals, fuel for heating and cooking, rent, electric light, household supplies, garbage removal, telephone, and *housekeeping service.* With this monthly amount of allowance, respondent rented a four-room house, maintaining it as a home, and employed a housekeeper who was required to devote her full time to taking care of him. For these services, he paid his housekeeper ninety dollars a month, besides providing her with board and room. So far as the record discloses, respondent is unmarried and has no near relative.

On March 28, 1947, following the legislative enactment of certain amendatory laws governing various branches of public assistance, the department, through its director, revised its rules for administering such assistance. This revision was communicated to the various county welfare departments of the state through what is designated as "Memorandum No. 47-33," a lengthy document setting forth, among other things, standards of assistance, standards of requirements, and estimates of the costs of supplying various items of assistance. A copy of this memorandum appears as an exhibit in the case. Further reference to certain portions of this document will be made as we proceed.

On May 1, 1947, the Chelan county welfare department, a subordinate agency of the appellant state department of public welfare, acting upon the authority of this memorandum, which had been communicated to the subordinate agency by the state department, reduced respondent's monthly allowance from $186 to $131. This reduction was made upon the assumption and theory that, under memorandum No. 47-33, the respondent from that time forth was entitled to receive as a total monthly allowance only the equivalent of what in the memorandum is referred to as the "Group II Nursing Home Rate," which rate was fixed by the department at the sum of $120, plus $11 for clothing and

personal incidentals, or a sum total of $131. The county welfare department considered this total sum as the ceiling amount beyond which it could not go, regardless of respondent's actual requirements or need.

Taking that amount as the ceiling, the county welfare department made an allowance of $92.20 to respondent to cover all of the items of assistance above enumerated except the items of telephone and housekeeping service. The telephone item it eliminated entirely, and for housekeeping service it allowed only the difference between $131, the ceiling amount, and the $92.20 allocated to the other items, or $38.80.

Deeming himself aggrieved by this reduction, respondent Straub made application for what is termed in the statute a "fair hearing" before the director of the department, in accordance with the provisions of Laws of 1947, chapter 289, § 6, p. 1367 (Rem. Supp. 1947, § 10007-138b). The application was granted, and a hearing was held, at which testimony was taken and transcribed for the record as subsequently brought to this court.

At the hearing, respondent testified concerning his physical condition and needs as follows:

"Q. Would you explain, in a general sort of way, Mr. Straub, what your general condition is? A. Well, I am blind, and I can't walk around. I have to get around on this chair. Do you want me to go into detail? Q. Yes, in your answer give in a general way why you feel you have to remain in your own home and shouldn't be transferred to a nursing home—why that is necessary in your particular condition. A. Well, Mr. Leahy [respondent's attorney], I don't want to go into this in detail, but it would work a hardship on me if I had to go into a nursing home, especially if I had to share a bathroom with anyone else or a bedroom. I think it would. I don't want to go into that, Lawrence [Mr. Leahy]. .- . . Q. How much do you pay each month for phone? A. $3.85. Q. Do you consider that a necessity for you, Howard? A. It is absolutely necessary, Mr. Leahy. Q. Why is it absolutely necessary for you? A. Well, the girl [respondent's housekeeper] goes out—has to go to the store or has to go to town for me, and there are a good many times when I am there alone. . . . Q. And the phone is

your only connection with the outside world? A. Yes. Q. And if something happened to you you would have no other means of contact with the outside world? A. It is absolutely necessary. . . . Q. Now do you feel it is necessary—going back to the subject of the housekeeper—do you believe it is necessary on your part to have a full time housekeeper? A. Absolutely. I couldn't eat if I didn't have. Q. Or do actually anything else? A. I couldn't do anything, I guess. I can't wash my face or comb my hair or shave myself or tie my tie or shoes. Well, she's just practically a housekeeper and nurse combined. Q. In other words, it is a twenty-four hour job, seven days a week? A. Yes, it is. I need her every day. She doesn't have a day off."

Respondent's attending physician, who at that time owned and managed the Cascade sanatorium, testified concerning the basic facts of respondent's physical blindness, paralysis, and kidney condition, as hereinbefore described. He further testified that it would be necessary to have a housekeeper in the home at all times to care for Mr. Straub; that the place for this afflicted person was in his own home; that it would be difficult for him to be taken care of elsewhere unless he were in a hospital, where graduate nurses or specialized help was provided; and that, if he were transferred from his home, it would have a markedly bad effect on his physical and mental condition.

The housekeeper's testimony corroborated that of respondent and his physician. None of the testimony of these three witnesses was in any way contradicted.

Miss Hallie Estes, who, as case work supervisor of the Chelan county welfare department, was conversant with the situation affecting the respondent, testified on cross-examination as follows:

"Q. Now, in reference to Administrative Memorandum No. 47-33, Section 424.82, in which you set a ceiling on all other items such as clothing and personal incidentals, the ceiling being $120.00, do you have the authority to set that total ceiling under the law as passed by the legislature, or is it by administrative memo only? A. This is based on administrative memo. . . . Q. You know of no other authorization, other than administrative memo, by which this $120.00 is set, is that correct? A. Yes, that's right.

. . . Q. In Exhibit No. 3 [State Form 'Authorization Of Payment,' setting forth computations of items of assistance], introduced by the department, you do not then actually arrive at it by putting down the actual needs of the applicant, is that correct? *In other words, when you reach the ceiling of $120.00 you have to stop, regardless of whether the actual needs of the applicant have been met or not, is that correct? A. Yes, that's right. In carrying out the administrative regulations it has been necessary to do that. Q. And that is why you arrive at the figure of $38.80 for the housekeeper, rather than the $90.00 actually paid, because that was the only amount left after giving all the other necessities? A. That's right. Q. In other words, the Department does not contend that $38.80 covers the applicant's need, is that correct? A. That's right."* (Italics ours.)

From all the testimony adduced at that hearing, the director of the department of public welfare made formal findings reciting:

"(1) He [Howard Straub] is totally blind and crippled to such an extent that he is unable to care for any of his personal needs such as cooking, eating, bathing and dressing.

"(2) Until May 1, 1947 when the appellant's [respondent's here] Aid to the Blind grant was reduced from $186 to $131.00, he had paid his housekeeper $90.00 per month. Since that time he has been in arrears on all payments to her."

The findings then refer to and quote from certain portions of § 17, p. 874, chapter 216, Laws of 1939 (Rem. Rev. Stat. (Sup.), § 10007-117a [P.P.C. § 922-35]), relating to public assistance, to which we shall make further reference later. The findings then set forth reasons for making the reduction in allowance as follows:

"Appellant's [referring to Straub, respondent here] total requirements other than housekeeping service were thus determined at $92.20. The standards of assistance of the State Department of Public Welfare provide that allowance may be made for housekeeping service, upon a doctor's recommendations, when the cost of such services does not increase the total requirement to an amount greater than the cost maintenance of the recipient in a Class II nursing home which cost is the amount of $131.00. Consequently, the county welfare department included in the appellant's

budget the amount of $38.80 for nursing service and authorized a grant of $131.00 for appellant effective May 1, 1947."

On the basis of these findings, the director of the department entered an order, the material portion of which reads:

"IT IS THEREFORE DECIDED that appellant [respondent here] is in all respects eligible for an Aid to the Blind Grant; that appellant is blind and in a crippled condition and *in need of housekeeping care*; that the Chelan County Welfare Department properly determined appellant's requirements for the eight basic items in the appellant's budget *and allowed $38.20 [$38.80] for housekeeping services, which was the maximum provided under the uniform statewide budgetary guide of the State Department of Public Welfare*; that the county welfare department properly determined appellant's grant at $131.00 a month effective May 1, 1947." (Italics ours.)

The order concluded with a denial of respondent's appeal from the decision of the county welfare department.

From that decision, rendered by the director in the fair hearing proceeding, respondent Straub appealed to the superior court for Chelan county, pursuant to the provisions of Laws of 1941, chapter 1, § 9, p. 8, as amended by Laws of 1947, chapter 288, § 5, p. 1360 (Rem. Supp. 1947, § 9998-42).

The court, after due consideration of the record filed by the department, entered judgment in which it expressly found the facts to be substantially as hereinbefore recited, and further expressly found that $38.80, the amount allowed by the department for housekeeping service, was "totally inadequate" for that purpose.

The court thereupon, by its judgment, remanded the proceeding to the department of public welfare with direction that it reinstate the original grant of $186, relating it back to May 1, 1947, and that the department include in the grant whatever percentage of increase the respondent was entitled to under that basis of allowance, considering increased living costs; the judgment further declared that a telephone was to be deemed a necessity in the instant case and ordered that the cost thereof be included in the grant allowed to the respondent.

Feeling dissatisfied with the judgment of the superior court, the department of public welfare appealed to this court.

The parties are agreed that, by a later revision of departmental rules, the item of expense for telephone has been covered, and hence that item is no longer a disputed factor in this case.

The principal question involved upon this appeal is whether the state department of public welfare in this instance acted arbitrarily, capriciously, unreasonably, or upon a fundamentally wrong basis when, by the application of a departmental rule or regulation, it placed a ceiling amount, fixed by the department itself, upon the total amount of financial assistance to be allowed and paid to the respondent, a needy blind person, regardless of the fact that such ceiling amount did not cover the respondent's actual needs as shown by the evidence and as specifically found by both the department and the trial court.

It appears to be conceded by counsel for both parties that the statutory law relating to or bearing upon the subject of public assistance to the needy blind is found in Laws of 1937, chapter 132, as amended by Laws of 1939, chapter 75, and by Laws of 1941, chapter 170; Laws of 1939, chapter 216, as amended by Laws of 1947, chapter 289; Laws of 1941, chapter 1, as amended by Laws of 1947, chapter 288; and Laws of 1947, chapters 286 and 287.

Section 1, p. 489, chapter 132, Laws of 1937, provides that there shall be created within the department of social security, now the department of public welfare, a division to be known as the Division for the Blind, which shall be charged with the duty of promoting, in the manner provided in the act, the welfare of blind persons, persons with seriously impaired vision, and persons suffering from conditions which might lead to blindness.

Section 10, p. 492, chapter 132, of the 1937 act, as amended by § 3, p. 462, chapter 170, Laws of 1941 (Rem. Supp. 1941, § 10007-8 [P.P.C. § 918-19]), provides:

"If the Local Administrative Board is satisfied that the applicant [who, to be eligible for assistance, must, under

§ 1 of the act, be "in need"] is entitled to assistance it shall, without delay, issue an order therefor to be paid from funds appropriated for public assistance, in monthly payments. The amount of assistance to which any applicant shall be entitled shall be, when added to the income of the applicant from all other sources, (including free items of maintenance and subsistence) not less than forty dollars ($40) per month. . . ."

This section of the act further provides that inconsequential items of income, items which are not actually on hand and available for use by the applicant when needed, inconsiderable sums from casual earnings, and unpredictable gifts of indeterminate value are not to be regarded as income; further, that no relative of an applicant, except of a minor, shall be legally responsible for the support and care of a blind person, and that assistance shall not be denied or canceled on account of any obligation or duty on the part of any person to support an applicant.

Section 18, p. 495, chapter 132, Laws of 1937 (Rem. Rev. Stat. (Sup.), § 10007-16 [P.P.C. § 918-37]), empowers the department to co-operate with the Federal social security board in any reasonable manner that may be necessary in order to qualify for Federal assistance to the needy blind, in conformity with the provisions of the Federal acts.

Section 1, p. 864, chapter 216, Laws of 1939, as amended by § 1, p. 1363, chapter 289, Laws of 1947 (Rem. Supp. 1947, § 10007-101a), provides:

"The word 'assistance' shall mean public aid to persons in need thereof for any cause, and shall include services, direct relief, work relief, medical and institutional care.

"The term 'budgetary basis' shall mean a basis taking into consideration *an applicant's need and resources*, and shall be measured *in relation to a basic minimum family budget* determined by the Department. . . .

"The term 'Federal-aid assistance' shall mean the specific categories of assistance for which provision is made in the Federal Social Security Act of August 14, 1935, including old-age assistance, aid to dependent children, services to crippled children, child welfare services, other handicapped persons, *aid to the needy blind* and any other category for

which the Federal government provides or for which it may hereafter provide matching funds.

"The term 'general assistance' shall mean assistance and/or service of any character provided to needy persons, not otherwise provided for, *to the extent of their need and the availability of funds,* including necessary medical, dental, optical, surgical, hospital and nursing care, drugs, medicines, artificial limbs, eyes, hearing aids and other needed appliances. . . .

"The term 'public assistance' shall mean and include Federal-aid assistance and general assistance. . . ." (Italics ours.)

Section 17, p. 874, chapter 216, Laws of 1939, in so far as material here, reads:

"Upon receiving an application for any category of Federal-aid assistance under this act, the County Administrator shall within forty-five days make or cause to be made such investigation as he may deem necessary to determine the applicant's eligibility therefor, and render his decision. . . .

"Such assistance may be granted only to such persons as are in need. *A person shall be considered to be in need within the meaning of this act who does not have resources sufficient to provide himself and dependents with food, clothing, shelter and such other items as are necessary to afford a reasonable subsistence.* . . ." (Italics ours.)

Section 3, p. 1365, chapter 289, Laws of 1947 (Rem. Supp. 1947, § 10007-117a), further amends chapter 216, Laws of 1939, by adding thereto several sections, of which § 17-a reads in part as follows:

"General assistance shall be granted under the provisions of this act *on the basis of actual need,* taking into account the income, resources and maintenance available to the individual from whatever source derived *and his necessary expenditures, and the facts and circumstances existing in each case.* There is hereby appropriated from the General Fund to the State Department of Social Security the sum of twenty-four million dollars ($24,000,000), or so much thereof as may be necessary, to provide general assistance in accordance with the provisions of this act and other laws governing the matter. . . ." (Italics ours.)

■ From a reading of the various statutes referred to above, it is apparent that the prevalence of blindness, the conditions which may lead thereto, and the circumstances often connected therewith have become matters of grave concern to the state, resulting in the creation of a state agency which is charged with the duty of taking active steps to promote the welfare of persons who are totally or partially blind or who are suffering from conditions which may ultimately lead to loss of vision.

Recognizing the fact that blindness is sometimes accompanied by other physical ailments, and often by an inability on the part of such afflicted persons to earn a livelihood or properly care for themselves, the state has undertaken to provide care and support for such needy persons, to the extent of their needs with respect to those items necessary to afford them a reasonable subsistence, and in so far as there are available funds therefor.

It is also apparent from a reading of these statutes as a whole that assistance is to be granted to the needy person on the basis of actual need, taking into account the income and resources available to him, his necessary expenditures, and the particular facts and circumstances concerning his individual case.

Pursuant to the authority granted by § 17, p. 494, chapter 132, Laws of 1937, as amended by § 5, p. 465, chapter 170, Laws of 1941 (Rem. Supp. 1941, § 10007-15 [P.P.C. § 918-35]), the director of the appellant department promulgated certain rules and regulations for administering public assistance and in March, 1947, made certain revisions thereof as indicated by memorandum No. 47-33, referred to above. We quote from the memorandum certain excerpts which we deem pertinent to the consideration of the matter before us.

Section 420 thereof, relating to standards of assistance, provides:

"Standards of assistance provide the Department with a procedure for determining need on a factual and comparable basis in behalf of all individuals. The standards of assistance consist of standards for determining requirements

and standards for evaluating income and resources. *They provide a means of determining how much the agency must add to what the individual may already have in order that he can meet his total need. Need, the basic factor in all public assistance programs, is, therefore, the difference between the applicant's total requirements and his income.* The standards of assistance are applicable for measuring need *in all categories* (including foster care), irrespective of source of public funds from which payment is made.

"People differ in their needs as a result of their individual situation; i. e., their varying means at hand to meet their individual requirements. They do not differ in their need according to the funds from which they may be aided although legislation may impose variation in payments or there may be differences in the basis of federal matching of state payments.

"The standards recognize that requirements of the individual differ according to the circumstances under which he lives, and that in determining his need, the requirements and resources of others necessary to his welfare should be considered in the computation. *Therefore, a public assistance grant may help provide for those persons who are important to the welfare of the applicant since such persons affect his need.*

"It is important not only to know but also to record in the case record the full extent of requirements, case by case, even though Department policy or limitation in funds at a given time may not in all instances permit fully or immediately meeting such need." (Italics ours.)

Section 422, relating to standards for requirements, provides:

"Requirements, or 'items in the budget' represent necessities of life. All people need food, clothing and shelter of some kind in order to survive. A public welfare agency has responsibility for determining what people need in order that they can live at a level of decency and health which is compatible with community standards.

"In the community represented by this state, people on the average need not only food, clothing and shelter but also fuel, utilities and personal and household maintenance. *Some people may also have needs unique but essential to them because of a health condition or other personal factor.* . . .

"In certain instances as specified in Section 422.8 requirements other than the basic items [which are elsewhere enumerated as food, clothing, shelter, fuel, electricity, water, household supplies, and personal incidentals] may be included *in order that undue hardship will not result to some few individuals who have needs not common to all, but needs which are, in effect, basic to them.* . . ." (Italics ours.)

Section 424, which has reference to the standards of assistance to be applied to a particular case, provides:

"Safeguarding the right of the person to apply for assistance is only the first step in assuring to needy individuals the benefits to which they are entitled under the law. A second step is recognition by the agency of what other persons are encompassed within the right of the applicant, that is, the other persons for whom he is responsible and whose need he must meet. This requires a definition of assistance units (see Section 424.1). *The third step is the proper allocation of requirements and income among grants so that the payment to the applicant reflects his actual need, irrespective of whether he is living by himself, with other public assistance applicants or with an independent family* (see Section 424.2)." (Italics ours.)

These rules and regulations constitute an interpretation by the department of its authority and duty under the statutes relating to public assistance, and there is no contention in this case that such interpretation is erroneous. We shall therefore assume that these rules and regulations as promulgated are valid, and that they correctly state the basis, provide the procedure, and prescribe the standards for determining need and granting assistance.

Section 420 of memorandum 47-33, quoted above, relating to standards of assistance, by its terms indicates that "need" is to be determined on a factual basis; that the departmental agency shall determine how much the department must add to what the needy individual may already have in order that he may meet his total need; that "need" is the basic factor in all public assistance programs and constitutes the difference between the applicant's total requirements and his income; that people differ in their needs as a result of

their individual situations; and that the requirements of the individual differ according to the circumstances under which he lives. Section 422 of the same document recognizes that a public welfare agency has the responsibility of determining what those people who may be under its supervision need in order to live at a level of decency and health compatible with community standards; that while all people in the community need food, clothing, and shelter, some people may also have needs unique but essential to them because of a health condition or some other personal factor; and that, in certain instances, requirements other than the usual basic items may be included in order to avoid undue hardship to those individuals who have needs not common to all, but nevertheless basic to them.

As heretofore stated, the evidence is all to the effect, and the court specifically found, that respondent's need requires that he be kept in his own home; that he could not get the needed care in a nursing home; and that, unless he receives the care which he has thus far been receiving in his own home, with the assistance of a housekeeper, he will suffer a decline in health and physical condition. This evidence was not disputed by the appellant department, nor did the department offer any evidence whatever on that issue. In fact, the department expressly found that respondent "is blind and in a crippled condition *and in need of housekeeping care.*" (Italics ours.)

The amount which the department in its original order allowed for housekeeping service was $90 a month, which was the amount respondent actually paid for that service. By its subsequent order, here under consideration, the department reduced that amount to $38.80 for the same service. The trial court held that the reduced amount was wholly inadequate for that purpose, and it needs no argument to support the court's conclusion. The department does not now contend that $38.80 covers the respondent's need in that respect. It allowed that amount solely upon the ground and for the reason that, the ceiling amount having been set at $131, the aggregate allowance for other nec-

essary items left only $38.80 to be allocated to housekeeping service.

To refute the charge of having acted arbitrarily and capriciously in reducing the amount of respondent's allowance, the department points to and relies upon §§ 422.82 and 422.83 of its rules and regulations. The first of these sections, relating to housekeeping service, provides:

*"The actual cost of housekeeping service is included if by so doing:*

*" (1) The total requirements of the individual, exclusive of clothing and personal incidentals, do not exceed the maximum of the Group II nursing home rate, and if,*

"(2) It permits the individual to continue living in his own home rather than requiring him to go to a nursing home, and

"(3) There is a doctor's statement to the effect that the individual is not physically able to perform such necessary activities around the home as laundry, cleaning, cooking, fuel and water carrying, etc., and

"(4) There is no other member of the immediate family living in the home, able to perform such services for the individual.

"Housekeeping service is distinguished from attendant or nursing service in that housekeeping service is not primarily concerned with personal care of the individual." (Italics ours.)

The second of these sections, relating to nursing home care, provides:

| "Nursing Home Group | Maximum Monthly Allowance | Maximum Daily Allowance |
|---|---|---|
| . . . | | |
| "II | $120 | $4.00 |
| . . . | | |

"Rates for nursing home care are not determined on a case by case basis, but are a flat monthly or daily rate for all public assistance patients in the home.

"The cost of nursing home care in an institution with which the CWD [County Welfare Department] has a written agreement, as provided within the medical care regulations, is included as a requirement *when the need for such care is recommended by a doctor. . . ."* (Italics ours.)

It will be noted that § 422.82 makes allowance for the actual cost of housekeeping service, *but only on condition*

that the total requirements of the individual, exclusive of clothing and personal incidentals, do not exceed the maximum of group II nursing home rate, which rate the department itself fixed at $120.

However, there is no evidence in the record before us as to what constitutes a group II nursing home, or that such an institution is accessible to the respondent, or that the department has offered to place respondent in such a home, or that such institution will provide the care and services required by respondent in his present condition, or that respondent will be cared for in a nursing home better than, or even as well as, he would be in his own home.

Appellant has set forth in its brief, under "Appendix A," a memorandum relating to standards and minimum-maximum rates for sheltered care, setting forth therein the requirements to which a group II institution must conform. However, that memorandum does not appear in the record, and, so far as we are able to tell, it was not called to the attention of the trial court. But even if we assume that there is, in fact, such a memorandum in operative force, still there is no evidence before us that a group II nursing home is available, or that its care and services have been tendered to the respondent, or that, if accepted by him, it will furnish service at least equal to that of housekeeping care. We refer again to the fact that the department, in its formal order reducing the amount of allowance to respondent, categorically stated that respondent is "in need of housekeeping care." This would seem to negative the thought that respondent could be adequately cared for in a nursing home.

In light of the statutes and the rules of departmental procedure set forth above, and upon the record brought to this court, we are of the opinion that the department proceeded upon a fundamentally wrong basis in determining the amount of assistance to be granted to the respondent. We hold that, before the department can properly apply the provisions of §§ 422.82 and 422.83 of memorandum No. 47-33 to place an over-all ceiling on the amount of assistance to be

paid to an individual recipient, at a figure below his actual need as found by the department, there must be at least a finding by the department that institutional care will meet such actual need of the blind person, and a showing that such care or service has been tendered to him and by him refused because of his preference to remain in his own home and accept the ceiling amount.

Appellant contends that the judgment of the superior court should be reversed for the reason that the court did not find, nor could have found from the evidence, that the action of the director of the department was arbitrary and capricious. It predicates this contention upon § 9, p. 8, chapter 1, Laws of 1941, as amended by § 5, p. 1360, chapter 288, Laws of 1947 (Rem. Supp. 1947, § 9998-42), which reads:

"The Court shall decide the case on the record and if it finds that the Director has been arbitrary or capricious, it shall remand the case to him for correction; otherwise the decision of the Director shall be affirmed. . . ."

It is true, as appellant states, that in its findings the trial court did not use the specific term "arbitrary and capricious." However, a fair interpretation of the language which the court did use is that the decision of the department was arbitrary, capricious, unreasonable, and predicated on a fundamentally wrong basis.

In *Sweitzer v. Industrial Ins. Comm.*, 116 Wash. 398, 199 Pac. 724, this court defined the phrase "arbitrary and capricious action" as follows:

"These terms, when used in this connection, must mean wilful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case. Action is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached."

This definition was quoted and approved in *In re St. Paul & Tacoma Lbr. Co.*, 7 Wn. (2d) 580, 110 P. (2d) 877, and *Morgan v. Department of Social Security*, 14 Wn. (2d) 156, 127 P. (2d) 686.

In the case at bar, appellant concedes that, if the action

of the department was unreasonable, it would fall within the ban of arbitrary and capricious conduct.

While courts universally are loath to interfere with the action of an administrative department when such action finally has been taken upon an important phase of the work for which the department was created, nevertheless, if it appears that, in reaching its determination, the department has proceeded upon a fundamentally wrong basis, or has acted arbitrarily or capriciously, the court will not hesitate to reverse or set aside such decision of the department. *Morgan v. Department of Social Security, supra.*

We consider the action of the department arbitrary and capricious, within the meaning of § 5, p. 1360, chapter 288, Laws of 1947, and therefore hold that its decision should be set aside; to that extent, the judgment of the trial court will be affirmed.

It will be recalled, from what has hereinbefore been stated, that the trial court in its judgment ordered the department to reinstate the original grant of $186 and to include therein that percentage of increase to which the respondent may be entitled, considering increased living costs. The court had no authority to render such a judgment. By Rem. Supp. 1947, § 9998-42, referred to above, the authority of the court is limited. If the court finds that the director has been arbitrary and capricious, it "shall remand the case to him for correction; otherwise the decision of the director shall be affirmed."

Having found, in effect, that the department had acted in an arbitrary and capricious manner, it was the duty of the court to remand the case to that tribunal for correction. It was for the department, however, not for the court, to make the correction and to determine, in the first instance, the amount of assistance that should be allowed to the respondent.

The judgment of the trial court will therefore be modified to the extent that it shall provide that the cause be remanded to the department for correction in a manner consistent with the views herein expressed.

MALLERY, C. J., BEALS, JEFFERS, and HILL, JJ., concur.