[No. 28618. Department Two. July 24, 1942.]

GUS E. ANDREAS *et al., Respondents,* v. JACK E. BATES, *as Commissioner of Unemployment Compensation, et al., Appellants.*[1]

[1]Reported in 128 P. (2d) 300.

*The Attorney General* and *William ·J. Millard, Jr., Assistant,* for appellant Bates.

*W. E. Heidinger* and *T. J. Hanify,* for appellant Snoqualmie Falls Lumber Company.

*Karl P. Heideman* and *John F. Walthew,* for respondents.

JEFFERS, J.—Gus E. Andreas and other persons employed in the shingle mill of Snoqualmie Falls Lumber Company, hereinafter referred to as the Lumber Co., filed claims for benefits under the unemployment compensation act, on or about November 11, 1940, and subsequently were given an initial determination of eligibility on the basis of wage credits within their base year. This determination was, by letter dated November 28, 1940, communicated to the Lumber Co., as the most recent employer.

The Lumber Co., as an interested employer, filed an appeal from the above determination, on the ground that "these men are out of work because of a strike on October 28, 1940, by Sawmill & Timber Workers Union, Local 2545."

Thereafter, pursuant to notices to all interested par-

ties, the matter came on for hearing on December 18, 1940, at Snoqualmie Falls, before William G. Preston, executive appeal examiner. All the claimants were represented at this hearing by their authorized representative, Arthur Brown, president of the Washington-Oregon shingle weavers district council, of which claimants are members. After the hearing was completed, and on January 17, 1941, the examiner made and entered findings of fact, conclusions of law, and a decision.

The final paragraph of the conclusions recites:

"We find that the unemployment of all of the claimants herein, subsequent to November 4, 1940, was due to a stoppage of work because of a labor dispute in which they were participating by reason of their failure or refusal to report for work. They are not entitled to the relief from disqualification provided by paragraphs (1) and (2) of section 5 (e) and consequently are ineligible for benefits for all unemployment subsequent to November 4, 1940, until the dispute is ended. They were involuntarily unemployed during week 44 (ending November 2), 1940, and are entitled to benefits for that week if otherwise eligible."

The decision reads:

"The determinations of the Unemployment Compensation Division finding the claimants herein to be eligible for benefits for unemployment subsequent to October 26, 1940, are hereby set aside; benefits shall be paid for week 44, 1940, if the claimants are found to be eligible in all other respects.

"Benefits for week 45, 1940, and all weeks subsequent thereto, until the dispute is ended, are denied."

Claimants, on January 24, 1941, petitioned the commissioner for a review of the decision of the appeal tribunal of January 17th. This petition for review, as appears from the petition, was made for the following reasons:

"That the employees were told that the saw mill would run one week before the shingle mill would

start and since have had meetings with foreman and told him the shingle weavers were ready to go to work and for him to see company about starting which they have failed to start. In the examiner's decision he stated in 1938 election was ordered by the national relation board and the shingle weavers had part this is not true, also in the general raise the shingle weavers had no part."

May we at this point state that counsel who appear for claimants in this court did not represent them before the examiner or the commissioner, but claimants at those hearings were represented by Mr. Brown.

On February 25, 1941, the commissioner filed an order affirming the decision of the appeal tribunal. March 25, 1941, claimants, appearing for the first time by present counsel, filed in the office of the clerk of the superior court for King county their notice of appeal to that court from the order of the commissioner, made February 25, 1941, affirming the decision of the appeal tribunal.

The matter was heard by the court upon the record as made by the appeal tribunal, and, after a consideration of that record, the court, on October 25, 1941, made and entered its decree, which, in so far as material, provides:

"It is ordered, adjudged and decreed that the actions of the appeal examiner and of the defendant as commissioner of the office of unemployment compensation and placement were arbitrary and capricious and that the findings of fact heretofore made by said appeal examiner and affirmed by the defendant as commissioner are not supported by legal and competent evidence herein, and therefore, it is further

"Ordered, adjudged and decreed that all of the claims involved in the above matter be and the same are hereby referred to the commissioner of unemployment compensation and placement who is hereby directed to proceed in accordance with the *said opinion*

*of this court* which is hereby referred to and made by reference a part hereof . . . " (.Italics ours.)

The opinion above referred to is a memorandum decision filed by the court in this matter on September 27, 1941. The portion of the memorandum opinion to which, as we understand it, the court referred in its judgment provides:

"It is the order and direction of the court that the record shall be again referred to the commissioner with instruction

"(1) To make further inquiry concerning any action or activity had by Local 2580;

"(2) That further evidence be offered in the record touching the action or activity of each and all of the claimants relative to his knowledge of any and all notice to return to work on November 4, 1940, and his attitude and conduct in connection therewith;

"(3) For such other or further evidence as in the judgment of the parties may be deemed proper and necessary herein."

While the attempt in this case, by reference, to incorporate into the judgment a part of the memorandum decision, would not affect the conclusion at which we have arrived, we do not think it good practice to attempt, by reference, to incorporate into a judgment a part or parts of a memorandum decision. The judgment should be complete in itself, and should contain any instructions the court feels the facts and law justify.

The Lumber Co. and the commissioner have appealed from the judgment entered, and have filed separate briefs herein. The contentions of appellants are in effect the same.

The following are the assignments of error: The court erred in entering judgment remanding respondents' claim to the department for the taking of further testimony; in holding that these claims could be remanded for such purpose; in refusing to enter judg-

ment confirming the commissioner's determination of ineligibility; in holding that the department's findings of fact were arbitrary and capricious; in failing to hold that the commissioner's determination of ineligibility was *prima facie* correct upon appeal to the superior court and that claimants had not disturbed that presumption by introduction of sufficient evidence; in refusing to hold that the department's findings of fact were supported by substantial evidence; in holding that the burden of proof before the appeal tribunal was not upon claimants to prove their eligibility for benefits; and in failing to hold that the claimants had not sustained their burden of proving that they were eligible for benefits for a stoppage of work due to a labor dispute.

It is first argued by appellants that this case must be reversed for the reason that the trial court had no jurisdiction or power to remand the cause to the commissioner with directions to take further testimony. With this contention of appellants we agree.

Section 6, chapter 162, Laws of 1937, as amended by § 4, chapter 214, p. 825, Laws of 1939, relative to court review, reads in part:

"(i) COURT REVIEW. Within thirty days after final decision has been communicated to any interested party, such interested party may appeal to the superior court of the county of his residence, and such appeal shall be heard as a case in equity but upon such appeal only such issues of law may be raised as were properly included in his application before the appeal tribunal. The proceedings of every such appeal shall be informal and summary, but full opportunity to be heard upon the issues of law shall be had before judgment is pronounced. . . .

"If the court shall determine that the commissioner has acted within his power and has correctly construed the law, the decision of the commissioner shall be confirmed; otherwise, it shall be reversed or modified. . . .

"In all court proceedings under or pursuant to this act the decision of the commissioner shall be *prima facie* correct, and the burden of proof shall be upon the party attacking the same." (Rem. Rev. Stat. (Sup.), § 9998-106 [P. C. § 6233-306] (i).)

In the case of *Ivey v. Department of Labor & Industries,* 4 Wn. (2d) 162, 102 P. (2d) 683, we had occasion to pass upon the power of superior courts, under Rem. Rev. Stat., § 7697 [P. C. § 3488], to review a decision of the department of labor and industries. Section 7697, *supra,* is almost, if not word for word, the same as the last paragraph of the portion of the section of the unemployment compensation act relative to court review, above set out. We are of the opinion that the *Ivey* case is authority for our conclusion that, under the unemployment compensation act, the court is required to hear and determine the case upon the record as made before the appeal tribunal or the commissioner, and that upon that record the court must either affirm the decision of the commissioner, or reverse or modify it, and that in no case does the superior court have the power to remand the case to the commissioner for the purpose of taking further testimony.

Our conclusion as to the limited power of the superior court on appeals from a decision of the commissioner is also substantiated by the case of *In re St. Paul & Tacoma Lbr. Co.,* 7 Wn. (2d) 580, 110 P. (2d) 877.

It is next argued by appellants that not only must the judgment of the trial court be reversed, but also the decision of the commissioner must be confirmed. This argument is based upon the contention that the commissioner found as a fact that respondents' stoppage of work was due to a labor dispute at the premises where they were employed, a fact which appellants contend the trial court did not question. Appellants contend further that stoppage of work being due to a

labor dispute, the burden immediately rested upon respondents to establish, to the commissioner's satisfaction, that they were not participating in or financing or directly interested in the labor dispute which caused the stoppage of work, and that they did not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing or directly interested in the dispute; further contending that this burden is imposed upon respondents by virtue of the provisions of § 5, chapter 162, Laws of 1937, as amended by § 3, chapter 214, p. 823, Laws of 1939, which provides:

"An individual shall be disqualified for benefits:

"(e) For any week with respect to which the commissioner finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this sub-section shall not apply if it is shown to the satisfaction of the commissioner that:

"(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: . . ." (Rem. Rev. Stat. (Sup.), § 9998-105 [P. C. § 6233-305] (e).)

We do not think it necessarily follows that the claims of respondents must be dismissed because the trial court was of the opinion there was inconclusive evidence to establish certain facts. The trial court found, and respondents contend, that the findings of the commissioner were arbitrary and capricious, and not supported by legal and competent evidence.

 *In re St. Paul & Tacoma Lbr. Co., supra,* in passing upon the power of superior courts under the unemployment compensation act, we stated:

"Looking to the quoted portion of the act in question relative to appeals taken to the superior court, and having in mind our former decisions relative to statutes of this nature, we are constrained to hold that the administrative determination of the facts is conclusive on the court unless it be wholly without evidential support or wholly dependent upon a question of law, or clearly arbitrary or capricious. It seems certain that the court which tries the case sits as a court of equity with limited powers. *The court shall review the issues of law which have been previously raised. The court shall review the power of the commissioner to act. The court shall review the facts only in so far as it is necessary to determine whether the commissioner has acted arbitrarily or capriciously, and whether he applied properly the law to those facts.*" (Italics ours.)

It may be that, under the trial court's interpretation of the facts and the law in this case, as appears from its memorandum decision and judgment, the trial court should have affirmed the decision of the commissioner. However, we are not bound by the interpretation of the facts or the law as found by the trial court, but it is our duty under the statute and our decision in the *St. Paul & Tacoma Lbr. Co.* case, *supra,* to examine the record and review the issues of law raised by respondents, and review the facts in order that we may determine whether or not the findings of fact upon which the decision of the examiner and the commissioner are based have any substantial evidentiary support.

 In reviewing the record, there is a presumption that the findings of fact are not arbitrary or capricious, and this presumption cannot be overcome by showing that there was evidence from which an opposite conclusion might have been drawn. It must appear that there was no room for a difference of opinion, and

that there was no substantial evidence upon which the findings of the commissioner could have been based.

The trial court seemed to be of the opinion that a statement made by E. H. O'Neill, manager of the Lumber Co., was the foundation upon which the appellate tribunal and the commissioner based the finding upon which their conclusion of rejection was made. Mr. O'Neill was asked the following question: "Have you carried on any negotiations during the period of time in question with that labor organization [Local 2580, *infra*]?" to which he replied:

"Yes, we asked representatives of the labor organization if they would go to work if we started the shingle mill, and we were told they would not go through the picket line."

The trial court in its memorandum opinion, in referring to the above statement made by Mr. O'Neill, stated:

"The foregoing broad accusatory statement by Mr. O'Neill, cited by the commissioner, concerning a matter with which the witness then and at other times claimed no personal knowledge, is the statement which becomes the foundation upon which the appellate tribunal and the commissioner seemingly base the important finding upon which their conclusion of rejection is made."

We are unable to agree that the rejection of respondents' claims by either the examiner or commissioner was based primarily upon the above statement by Mr. O'Neill.

■ The commissioner was entitled to consider the following facts, as a basis for his findings and decision: The Lumber Co., on or about October 26, 1940, owned and operated a manufacturing plant at Snoqualmie Falls, Washington, where it manufactured lumber, shingles, and other forest products. Included within the plant area are two sawmills, a planing mill, shingle mill, loading shed, power house, and other buildings.

Adjacent to the premises is a log pond, from which logs are taken for the shingle mill and sawmills as needed. The shingle mill was a department of the general operations of the company. The log pond, shipping facilities, and power plant were used in common by the various departments.

All the employees of the shingle mill, as well as the other employees at the plant, generally used two main entrances in going to and leaving their work.

These respondents were all members of the Washington-Oregon shingle weavers district council, Local 2580, affiliated with the American Federation of Labor. This union will hereinafter be referred to as Local 2580. Prior to the dispute in question, all the respondents were employed in the shingle mill of the Lumber Co. The employees of the sawmill were members of the sawmill & timber workers union, Local 2545.

While the power with which the sawmills and shingle mill were operated was normally generated on the premises of the Lumber Co., in its own power house, the Lumber Co. has a permanent hookup with the Puget Sound Power & Light Company, from which the Lumber Co. can at any time take sufficient power to operate all its mills. The shingle mill can operate independently of the other mills and has, on many Saturdays, so operated.

About fifty men are regularly employed in the shingle mill, and several hundred in the sawmill, planing mill, and elsewhere about the plant. While the plant is not enclosed, all the men generally enter and leave the plant by the two main entrances.

Mr. O'Neill, general manager of the Lumber Co., testified that in 1938 an election for the purpose of determining the bargaining agent for the employees of the Lumber Co. was ordered by the national labor relations board; that an election was held, and, as a

result thereof, sawmill & timber workers Local 2545 was certified as the bargaining agent for all the employees, including the shingle weavers. Mr. O'Neill also testified that the shingle weavers took no part in the election called by the national labor relations board. Harry Martin, a member of the executive committee of Local 2545, and V. C. Douglas, secretary of that local, called by respondents, testified that Local 2545 had no jurisdiction whatever over the shingle weavers, and each witness stated that so far as he knew there would have been no objection to the shingle weavers going through the picket line on November 4th, which was the date on which the shingle weavers were informed the shingle mill would reopen. Mr. Douglas further testified that so far as he knew no instruction had ever been given by Local 2545 as to whether or not the shingle weavers would be permitted to go through the picket line. Apparently the testimony of Mr. Douglas, at least, was based upon his personal opinion, for in answer to a question as to whether or not if the shingle mill were "started tomorrow" it would be all right with his union, he answered: "I can't speak about the union, but the question never has been brought up as far as I know."

Whether or not Local 2545 represented and was the bargaining agent for the shingle weavers, the testimony is undisputed that, from about September, 1940, up to October 26, 1940, certain demands were made by Local 2545 for an increase in pay, a week's vacation with pay, and a union shop. During this time, several meetings were held, and apparently the question was ironed out, except the one as to a union shop. As to this last question, the company took the position that they would not compel an employee to join any organization, but he would be free to join if he desired. The last meeting was held on Saturday, October 26th, at which time

both the union and the company held to their positions relative to a union shop. It does not appear that at that meeting anything was said about a strike.

On Friday, October 25th, Vivian Bashaw, plant superintendent, informed Alexander P. Steele, shop foreman, that the shingle mill would be down for the week of October 28th, because of lack of orders. This witness further testified that his instructions came from the management, and he understood that the mill would run the following week; that the shingle mill was in condition to operate to full capacity, with logs in the pond. He further stated that in his opinion the failure of the shingle mill to open after November 4th was due to the picket line around the plant and the failure of the employees of the shingle mill to report for work; that he knew of no other reason why the shingle mill was not operating; that, at the time he gave the instructions to Mr. Steele, he did not know that a strike was to be called. At the conclusion of his direct examination, Mr. Bashaw was asked the following question: "Is it a fact that on October 25th you instructed Mr. Steele that the mill would reopen on the 4th of November?" to which he answered, "Yes, sir."

Mr. Steele testified that he was the shingle mill foreman, and had occupied that position for five years; that on October 25, 1940, Mr. Bashaw notified him the shingle mill would shut down Saturday night for one week, starting up again November 4th; that, after receiving these instructions, he went around and notified the crew, "I told them we had orders from the superintendent we would shut down Saturday night and start up November 4"; that the night foreman was instructed to tell his crew, which he did when they came on shift. Mr. Steele further testified that he was at the mill November 4th, expecting the mill to start, and it could have run if the shingle weavers had reported

for work; that he did not tell Mr. Burgett, the shop steward, or any other man that the shingle mill would not start November 4th. This witness several times in his testimony stated that he instructed his men that they were off until November 4th, and that this order was never changed or modified; that none of the employees of the shingle mill had reported for work since November 4th.

While it does appear that, in an informal discussion between Mr. Bashaw and Mr. Steele sometime after November 4th, they discussed the question of whether or not the shingle mill would start until the sawmill had run a week, Mr. Bashaw stated there was nothing official in this discussion, as he had never been informed by Mr. O'Neill, from whom he received his orders, that the shingle mill would not start until the sawmill had run a week. There is no testimony in this record that any violence was used by the pickets or any attempt at intimidation.

On Sunday evening, October 27th, about nine o'clock, two representatives of Local 2545 called at the home of Mr. Bashaw and advised him that the employees would be out on a strike the next morning, October 28th. On that date pickets were stationed at the two main entrances to the plant, at which stations the pickets continued up to the time of the hearing.

Ernest Burgett, steward of the shingle department, being called by respondents, testified that he was told by Mr. Steele on October 25th that they would be down on account of the shingle market, and he was not told any specific date when he was to come back to work; that he had been asked to come back to work; that Local 2545 at no time dictated the policy of the shingle weavers union; that he did not contact the company to see when the mill was going to start. This witness was asked if he was familiar with the agreement between

the red cedar shingle manufacturers and the Washington-Oregon shingle weavers district council, of which organization the shingle weavers are members, and he answered that he was. This contract was admitted in evidence, and so far as material provides:

"During the life of this agreement, no member of the union shall be required to work under police protection or go through a legitimate picket line."

Mr. Burgett testified that the policy of this agreement was the policy of Local 2580, and that his union followed that policy; that none of the shingle weavers had gone to the plant to determine whether or not work was available, because they were never notified by Mr. Steele to come back to work. He finally testified that he did not know what the foreman had told the rest of the men, but the foreman never told him the mill would open November 4th.

Joe Cook, called by respondents, was an employee of the shingle mill when it closed. He testified that he was not told they were laid off for any definite time; that, on November 10th when he had called for his check, he had inquired of the time keeper, who stated he did not know when they were going to start. Mr. Cook, like Mr. Burgett, when asked whether or not, if he were called to work the following day, he would go through the picket line, answered in substance that he would go to the picket line and then use his own judgment as to whether or not he would go through.

It was brought out in the cross-examination of Mr. Steele that he had told two or three of the men that the shingle mill would not start until the sawmill had run a week. It appears that there was no official order that the shingle mill would not start on November 4th. There is no testimony that Mr. Steele ever informed any of the men, other than those who testified herein, that the shingle mill would not start until the sawmill

had run a week; so, in so far as this record is concerned, it appears affirmatively and without dispute that Mr. Steele told all of the employees of the shingle mill, other than Mr. Burgett and Mr. Cook and possibly one other, that the shingle mill would start on November 4th, and that this order was never modified or canceled.

There was no testimony given of any action of Local 2580, of which respondents were members, as a union, relative to this strike, and we have in the record only the testimony of two of the respondents as to what they personally were told by the foreman, and as to their attitude relative to the picket line.

There is no testimony relative to any action by Local 2545, as a union, in regard to whether or not the shingle weavers or any other employees would be permitted to pass the picket line, or as to whether or not Local 2545, in calling the strike, purported to act for all the employees and picketed all the departments. We do, of course, have the testimony of Mr. Martin and Mr. Douglas, members of Local 2545, as to their personal opinion that the strike did not involve the shingle weavers, and that the shingle weavers would have been permitted to pass the picket line had they so desired.

Mr. Brown stated that he would not call any of the other respondents, as they could add nothing to what had been testified to.

While there is a conflict in the record as to whether or not Local 2545 was the bargaining agent for the shingle weavers, as there is also as to whether or not the employees of the shingle mill, at least the two who testified, were notified to return to work November 4th, we certainly would not be justified in saying that there was no substantial evidence to support the finding of the commissioner that the employees of the shingle mill were notified to report for work November 4th, and that this order was never changed or modified.

338

We are also of the opinion that this record substantiates the finding of the commissioner that the shingle mill was ready to operate November 4th, and has been at all times since, regardless of whether there was power being generated on its own premises, as it had the hookup with the Puget Sound Power & Light Company, from which it could get power at any time.

While the stoppage of work on Monday, October 28th, in so far as the shingle weavers were concerned, was not due to a labor dispute, as the shingle weavers had been notified not to return to work until November 4th, which fact was recognized by the commissioner, as he allowed compensation to respondents for the week of October 28th, we are of the opinion this record justifies the finding of the commissioner that, on and after November 4, 1940, the stoppage of work of the shingle weavers was due to a labor dispute; and, while we are of the opinion this record justifies the finding of the commissioner that respondents did participate in this labor dispute on and after November 4th, by refusing to report for work and pass through the picket line, in any event there was an entire failure on the part of forty-eight of these respondents, at least, to show to the satisfaction of the commissioner that they were not participating in, or financing, etc., the labor dispute existing at the plant, and that they did not belong to a grade or class of workers which immediately before the commencement of the stoppage were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing or directly interested in the dispute.

We agree with the trial court that this record, on the part of respondents, is not as full and complete as it might have been, but, in our opinion, no blame could or should be placed upon the appeal examiner or the commissioner for this lack of testimony. Mr. Brown,

representing the respondents, was given every opportunity to present his evidence, and surely it is not the province or duty of the appeal tribunal or the commissioner to tell the parties that they should or should not present more testimony.

We, like the appeal examiner and the commissioner, can come to no other conclusion than that the reason for respondents' failure to report for work on November 4th was that they did not desire to pass the picket line.

Conceding that Local 2545 had no jurisdiction over these respondents and that the picket line was established by Local 2545, the refusal of respondents to pass the picket line would, under the facts in this case, constitute a participation in the labor dispute under our decision in the *St. Paul & Tacoma Lbr. Co.* case, *supra*. We are in entire accord with all that was said in the case last referred to, and, on the authority of that decision and the decision in the *Ivey* case, *supra*, as applied to the record in this case, we conclude that the judgment of the trial court must be and it is reversed, with instructions to enter judgment confirming the decision of the commissioner.

ROBINSON, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.