## TEXAS CO. v. TEXAS EMPLOYMENT COMMISSION et al.

### No. 4816.

Court of Civil Appeals of Texas. Beaumont.

Sept. 17, 1953.

Rehearing Denied Oct. 7, 1953.

King, Sharfstein & Rienstra, Beaumont, for appellant.

John N. Barcus, Austin, Bliss Daffan, Houston, for appellees.

PER CURIAM.

The appellant, The Texas Company, brought suit in the district court of Jefferson County against the appellees, the Texas Employment Commission and forty-four individuals, to secure a judicial review of a final decision and award by Texas Employment Commission of unemployment compensation benefits to the forty-four individual appellees, employees of the appellant. The district court heard the case without a jury and rendered judgment in favor or appellees, holding that the decision of the Texas Employment Commission was supported by substantial evidence and that the substantial evidence rule applies to decisions and awards of such commission. The appellant has duly perfected its appeal from such judgment, under the provisions of the Texas Unemployment Compensation Act, Article 5221b—1 et seq., Vernon's Annotated Civil Statutes of Texas.

The core of this dispute is to be found in the construction of the following portion of said Texas Unemployment Compensation Act, Article 5221b—3(d):

"An individual shall be disqualified for benefits:

*     *     *     *     *     *

"(d)· For any benefit period with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises (including a vessel) at which he is or was last employed, provided· that· this subsection shall not apply if it is shown to the satisfaction ·of the Commission·that:

"(1) ˙ He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work".

The forty-four individual appellees were non-striking employees of the appellant before and during the strike of the Oil Workers Union at the several plants of appellant in Jefferson County in 1950. They were machinists and were members of the Machinists Union, which is a separate union from the Oil Workers Union, the one which was on strike. The appellant had work for them at its plants where they were regularly employed and so notified them. They appeared at the plants ready to work but did not cross the picket lines of the striking oil workers union. They testified that their refusal to cross the picket lines was caused by their fear of physical violence to themselves and their families by the strikers. The appellant says that if they had such fear it was groundless, and that no violence had occurred at that time at any of the gates to any of its struck plants; that such refusal to cross the striking union's picket lines was in effect a participation in the strike of the members of the oil workers union, within the meaning of the language of the section of the statute quoted above, and that they are thereby disqualified from receiving such benefits of Unemployment Compensation.

The men have been paid their compensation, and the appeal does not have the effect of a supersedeas or stay of the award, by the express provisions of the Act itself.

Both the appellant and the appellees have presented most able and excellent briefs on appeal. The principal question to be decided here .is one of first impression in the jurisprudence of this. state, and the parties in their briefs have. favored the court with thorough discussions of the various law questions involved.

By its first point, the appellant contends that the trial court erred in affirming and sustaining the decision of the Texas Employment Commission awarding unemployment compensation to the individual appellees, thereby holding that said individuals were not "participating in" a labor dispute within the meaning ·of the Texas Unemployment ˙Act, the section quoted above, when they refused to cross a picket line to perform their available ˙work. By its second point it contends that the trial court erred in concluding as a matter of law that there is no participation in a labor dispute within the meaning of the quoted section of the Texas Unemployment Compensation Act when it is established that the non-striking employees failed to cross a picket line because of fear of violence which is well founded. These points are presented together in the brief, and we·consider them together here. The appellant does not contend that .the individual appellees, the non-striking employees, were financing or directly interested in the labor dispute then in progress. As stated in its brief, "its sole contention is that the appellee claimants, in failing and refusing to cross the respective picket lines established by the striking unions, and to perform work available to them, were thereby "participating in" the labor dispute in question and are thereby disqualified for benefits". It cites no Texas case as authority for this statement; and there is none. We might add that there are no Texas decisions to the contrary. Appellant cites and relies upon three decisions by the Supreme Court of Washington and one by the Supreme

Court of New Jersey in support of its view of the law. They are In re Persons Employed at St. Paul & Tacoma Lumber Company, 7 Wash.2d 580, 110 P.2d 877; Andreas v. Bates, 14 Wash.2d 322, 128 P.2d 300; In re Polson Lumber & Shingle Mills, 19 Wash.2d 467, 143 P.2d 316; Aitken v. Board of Review of Unemployment Compensation Commission, 136 N.J.L. 372, 56 A.2d 587. We find that these cases are predicated to a great extent upon the fact that the claimants refused to cross the picket lines because of their belief in union principles, and not because of any fear of bodily harm. They are not in point and are of no assistance to us in the immediate question under study.

The appellees freely concede in their brief that if the individual appellees refused to cross the picket lines of the striking union in this case because of union principles in opposition to crossing any picket lines, then they would be participating in the strike and would be ineligible to the benefits of the Unemployment Compensation Act. The case of Meyer v. Industrial Commission of Missouri, 240 Mo.App. 1022, 223 S.W.2d 835, dealt with the question of whether one who refuses to cross a picket line because of well-founded fear of physical violence and harm is participating in a labor dispute, within the meaning of an unemployment compensation act similar to the Texas act. The principle is announced there that such a refusal would not be a voluntary refusal to cross the picket line and hence would not constitute participating in the labor dispute. In that case the court upheld the state commission in refusing unemployment compensation because of its holding that the claimants had no actual reason to fear violence. The rule is stated, however, as is contended for by the appellees. In the case of Steamship Trade Association of Baltimore, Inc., v. Davis, 190 Md. 215, 57 A.2d 818, 820, the Maryland Court of Appeal passed upon the the question and arrived at the same conclusion as to the law. The court there held:

"The basic question before this Court is whether there were material facts to support the findings of the Board that the appellees did not participate in the strike * * * from * * * to * * *. It is admitted by the claimants that they did not cross the picket lines established by the strikers on the dates in question. They alleged, and the Board found, that the reason the appellees did not cross these picket lines was because of a fear of physical violence evidenced by the threatening attitude of the strikers.

"The courts must presume that strikers are law-abiding. There must be more than a mere theatrical threat of violence. The fear of violence must be real and not nebulous. Just because claimants say that they are afraid of the pickets is not enough and the mere presence of the pickets is not enough to excuse claimants from crossing picket lines."

The court then reviewed the evidence of threats of violence proved, and found that it was in support of the finding of the Board; that the men were entitled to unemployment compensation and were not participating in the strike. It also distinguished its holding in the recent case of Brown v. Maryland Unemployment Compensation Board, 189 Md. 233, 55 A.2d 696, 698, in which it held that a non-striking workman who voluntarily refused to cross a picket line was participating in a labor dispute and was therefore ineligible to unemployment compensation. It pointed out that in the Brown case there was no evidence of any threating attitude on the part of the strikers and no evidence of fear of violence. It held that in the case before it, the Davis case, the evidence of threats and fear of violence was sufficient to support the order of the Board, and affirmed it, allowing compensation benefits.

The appellant argues under these two points that if it be held in the present case that a claimant who refuses to cross a picket line of another union because of a well-founded fear of violence and physical harm is not participating in a labor dispute,

then the court would be entering the legislative field and engrafting upon the Texas Unemployment Compensation Act a clause which the legislature did not include in the act. We do not agree. It is believed to be logical that had the legislature foreseen that such a situation would arise in the administration of the Unemployment Compensation Act as the present one, and it had intended that a non-striking workman who refuses to cross a picket line because of well-founded fear of physical violence to him or his family should be ineligible to receive the benefits of the Act, it would have so stated in plain unambiguous language. Quite evidently the legislature foresaw that a situation would arise in the administration of the Act when some workmen were going to be unemployed because of a labor dispute at their place of employment and that not all of them ought to be ineligible to receive unemployment compensation. It therefore provided that benefits of the Act should be allowed to go to those who could show, to the satisfaction of the Commission, that they were not participating in or financing or directly interested in the labor dispute which caused the stoppage of work. The legislature took this practical and realistic view of the possibilities as to future happenings in labor disputes and strikes, knowing that there had been violence in labor disputes long before the Unemployment Compensation Acts were passed in the various states of the union, and *would* probably continue to occur after the acts were passed. It stated in the preamble to the Act that its purpose was to "provide an orderly system of contributions for the care of the justifiably unemployed during times of economic difficulty". We believe that a nonstriking workman who is prevented from going to his job at a plant where a strike is in progress by threats and fear of violence is justifiably unemployed, that he is not participating in the strike, and that he is entitled to the benefits of the Act.

The trial court was not in error in its holdings complained of in appellant's first and second points and they are overruled.

The appellant's third point is that the trial court erred in holding that the trial of the cause was governed by the applicability of the substantial evidence rule. The substantial evidence rule is a rule of law by which the courts have limited their power to review an administrative agency's orders and decisions in the exercise of the discretion granted to the particular agency by the Legislature. Where the Legislature has granted an administrative body a discretionary power, the court will not substitute its own discretion for that of the administrator, and if the action of the administrative agency is reasonably supported by substantial evidence introduced before the court, the court will affirm the administrative agency's actions. Railroad Commission v. Shell Oil Company, 139 Tex. 66, 161 S.W. 2d 1022; Board of Firemen's Relief & Retirement, etc. v. Marks, Tex.Sup., 242 S.W. 2d 181, 182, 27 A.L.R.2d 965, and cases cited therein. At the time when the instant case was submitted there was but one authority in Texas holding that the Texas Employment Commission was such an agency and that its orders and acts must be reviewed by the courts in compliance with the substantial evidence rule above. That was the case of Todd Shipyards Corp. v. Texas Employment Commission, Tex.Civ.App., 245 S.W.2d 371, and that case was then before the Supreme Court on application for writ of error. The court in that case held that the substantial rule applies to an action by an employer to review a decision of the Texas Employment Commission. The Supreme Court recently refused the application for writ of error, no reversible error. We assume therefore that the question has been settled in this state and on the authority of Todd Shipyards Corp. v. Texas Employment Commission, supra, we make the same holding here and the third point is overruled.

Appellant's points number four to twelve, inclusive, attack in various ways the sufficiency of the evidence in the trial court to show that the decision of the Commission was reasonably supported by substantial evidence. It relies to some extent

upon various findings of fact made by the trial court. It refers to the original findings of fact and to additional findings of fact made by the trial court in response to appellant's requests therefor. We have concluded that these findings can have no bearing upon the disposition of this appeal. The Employment Commission, the administrative agency, is the fact-finding body and the question to be determined by this court is strictly one of law. Furthermore, the question must be determined by the court from a consideration of the entire record in the case as that record has been made in the trial court. The test is not whether the evidence admitted in court preponderates against the administrative decision, nor yet whether there is merely some evidence to support the decision. The test is whether the administrative decision finds reasonable support in substantial evidence. Board of Firemen's Relief & Retirement Fund Trustees v. Marks, Tex.Sup., 242 S. W.2d 181, at page 183. With this test in mind, it becomes our duty to evaluate the evidence in this case and determine whether it is substantial evidence which reasonably supports the ruling that the individual appellees, the claimants, were deterred from crossing the strikers' picket lines at the appellant's plants by well-founded fear of violence and bodily harm.

On April 4, 1950 the Oil Workers International Union and its Locals Nos. 23 and 228, because of labor dispute with the appellant, The Texas Company, called a strike and stoppage of work against the appellant's plants located at Port Arthur and Port Neches in Jefferson County, Texas. Picket lines were established at the Port Arthur Works, the Case and Package Division, approximately three miles from the Port Arthur Works, and the Port Neches Works, located at Port Neches about nine miles from the Port Arthur Works.

The forty-four appellee claimants were not members of the Oil Workers Union but were members of the International Association of Machinists and the local lodges thereof. Of the said forty-four claimants, twenty-six were employed at the appellant's Case and Package Division in Port Arthur and eighteen employed at its Port Neches Works. The local lodges of such Machinists Union were the certified bargaining representatives of the forty-four claimants. They were under contracts with The Texas Company which governed their rates of pay, wages, hours of employment and other conditions of employment. Their contracts provided for no strikes, stoppage or slowing down of work on the part of the machinists and the Company agreed that there would be no lockout of the union on the part of the Company.

During the entire course of the strike from April 4, to July 31, 1950 work was available to each of the appellee claimants at their accustomed jobs.

When the several individual claimants appeared at their respective places of employment for work on the morning of April 5, 1950, the first day of the strike, pickets were established at the entrance gates at the two plants where they worked. In addition there were large congregations of striking Oil Workers Union members within the immediate vicinity of the entrance gates of both plants. On being informed that a strike was in progress the claimant appellees did not cross the picket lines to work at their respective jobs because of their fear of the consequences to themselves and their families if they did so. They immediately notified their business representative of the situation and were told by him that under the terms of the existing contract between their respective Machinists Union locals and the appellant it was their obligation to report to work notwithstanding the strike of the Oil Workers Union and the presence of the picket lines. The individual appellees expressed to him their fear of violence directed against them or their families if they crossed the picket lines and stated that they were unwilling to take a chance unless some assurance was given to them that they would not be the victims of violent action.

On April 6th representatives of the claimant appellees visited the strike strategy committee of the Oil Workers Union and

told the committee that they were not parties to any dispute between the Oil Workers Union and the appellant and that they desired to work. They asked the committee for permission to cross the picket lines. The strategy committee replied in effect that it was against the policy of the Oil Workers Union to permit anyone to report for work during a strike and that for this reason such permission could not be granted. The committee was then asked what would happen to them if they did cross the picket lines. The reply of the committee was that any attempt to cross the picket lines would not go unnoticed and that some form of retaliation would be taken against the claimant appellees if they did cross the picket lines. When this answer was reported to the claimant appellees they made no effort to cross the picket lines to report for work because of their fear of the threat contained in the statements made to them by the strategy committee of the Oil Workers Union.

On April 25th news sources reported that the picket lines of the Oil Workers Union would be withdrawn on April 26th and that the plants would reopen. Claimant appellees reported for work at the time the picket lines were withdrawn and all of them worked during the course of April 26th. When they again reported for work on April 27th they found that picket lines were reestablished as they had been since the strike began, and they did not cross the picket lines to go to work because of their fear of violence directed against them and their families. They did not cross the picket lines or make any attempt to do so during the remainder of the strike. The district representatives of the Machinists Union testified that at no time during the course of the strike did they individually or as representatives of their locals seek any relief or protection from civil authorities or make any effort to obtain any injunctive relief or protection through the courts.

The district representative of the Machinists Union testified that he met with officials of the appellant company at the inception of the strike with a view of seeking protection for the claimants in performing their work. He was advised by said officials that such employees would receive ample protection while in the plant but that the matter of their protection outside of the plant was up to the appropriate civil authorities. He further testified that he explained to the appellant's officials that from what he had seen around there since 1944 where his group had about twenty members and the striking union had seven or eight thousand members he and his group did not have very much chance with the civil authorities. He further testified in detail on cross-examination in this regard as follows:

"Q. That fear then, Mr. Fitzgerald, would be based on the supposition that there would be a complete breakdown of your civil authorities and your courts to enforce the law and order, is that correct? A. No, sir. I have all the respect for the authorities, our legal departments, sheriff's department, etc., I have a very high respect for them. I have been very close to them and very cooperative, I might say, but a lot of these jobs are political, they are elective and the people depend on the votes at certain times of the year and they like to be friendly with me and my little group but the people in the driver's seat were big shots so they are going to be naturally a little more friendly with them.

"Q. Your idea then is that since the oil workers have the vast majority of votes over what your membership can muster, that these officials, I am talking about law enforcement officials, etc., would shirk their duty as the law prescribes and would not give you protection you are entitled to? A. I would not say they were shirking their duty, but I would say they were using their best judgment politically or otherwise. I don't think they are going to give me or my small group of fifteen or twenty or thirty people as much consideration as they will seven or eight thousand, I will say it that way.

"Q. Is that the reason you, yourself, did not appeal to any of the civil authorities? A. No, sir. I would not say that was the

sole reason but it had quite a bit of bearing on it, yes, sir."

During the entire period of the strike in question no acts of violence and no threats of violence occurred or were made at or in the vicinity of the picket lines established at the entrance of the Port Neches Works or at the entrance of the Case and Package Division.

During the entire period of the strike no acts of violence or threats of violence were directed against any of the appellee claimants or any member of their families except the general threat to be found in the statement of the strategy committee which is mentioned above.

No acts of violence and no threats of violence occurred at or in the vicinity of the pickets at the entrance of the Port Arthur Works from the beginning of the strike until June 18, 1950.

During the entire period of the strike the supervisory employees, technical employees and confidential secretaries crossed the picket lines on every work day without any violence or threats of violence, at the Port Neches Works. During the entire period of the strike administrative and supervisory employees crossed the picket lines on their scheduled work days at the Case and Package Division without any violence or threats of violence against them.

A back-to-work movement was begun by the appellant posting notices in the daily newspapers and announcing over the radio that the plants would be reopened for operation on June 19th. In connection with this movement the evidence discloses numerous acts of serious violence committed against the persons attempting to cross the picket lines and also shows threats being made to their families. Isaac Speyrer testified that he was employed at the main plant of the Port Arthur Works and was not a member of the Oil Workers Union; that after the strike began on April 5th he did not report to work until June 19th. At that time he was accompanied by three other employees in a car owned by one of them. When they got out of the car a block from the entrance gates of the plant his arm was grabbed by a man whom he recognized as a fellow employee and a member of the striking union. This man asked him if he was going to work and Speyrer said that he was. When he did so he was struck on the head a number of times and knocked unconscious. He entered the hospital later the same day where it was found that he had a fractured skull. He was in the hospital 17 days and was unable to return to work until after the strike ended. Bill Smith testified that he was with Speyrer on the occasion he testified about and that on that occasion four men assaulted him, three of them holding him down while the fourth stomped him with the heel of his shoe and that during the course of the beating he was invited by one of the employees who had assaulted him "down to the C.I.O. Hall to get a square meal." He further testified that he entered the plant after the beating but remained in the plant continuously for his own protection until the end of the strike. Eddie Booker testified that he was along with Speyrer and Smith on the occasion of June 19th and that when they attempted to walk from their car to the plant a crowd of about fifty men attacked him and the others and assaulted them. Following the attack he did not go to work but went to his home. Later he received a visit from a representative of the Oil Workers Union who requested him not to return to work because he might get into trouble. He did not return to work until shortly before the strike ended. George Romano, a supervisor in the Shipping Department at the Port Arthur Works, testified that he continued to work after the strike began and was furnished a pass which enabled him to cross the picket line. On July 1st, while the strike was in progress, he went into the town of Port Arthur to pick up his daughter, who was working in a store and his son-in-law who was also employed in town and as he and his son-in-law were walking together a man he recognized as a member of the striking union confronted him and asked him "Red don't you think it is kind of dangerous,

you walking around town?" Romano replied that he did not think so and as he walked across the street he noticed several men following him. After he picked up his daughter he noticed the three men still following him as he went to his car. Two of the men came to the window of his car and one of them stated: "Red, if I was you I would stay out of town" and then struck him across the forhead with his fist. Shortly after returning to his home he received an anonymous telephone call at his home from someone who advised him to watch his step. E. L. McMann, an electrician employed at the Port Arthur Works, testified that he was on his way to work about 7 o'clock in the morning on his bicycle about August 13th; that after he had gone about a block from his home something struck him and he lost consciousness. When he came to his head hurt and he was lying on the street. Several men were around him and his hands were being held. He told the men he was a member of the A.F. of L. and was told by the man holding him that it did not matter who he was, he was going in the plant and then one of the men began stomping him in the face with his heel and others in the group began hitting him on the head with a club and whipping him with a rubber hose. He then lost consciousness and does not recall anything until he came to with several people standing over him. As a result of this beating one of McMann's eyes was so badly injured that it had to be removed surgically. He also testified that as a result of the beating charges were filed against the owner of the car, a man by the name of Luther Wright, but that he did not know what had become of the charges and he had not testified in any case involving it. Mrs. Stewart Haines testified that her husband was employed as a machinist at the Port Arthur Works and that he did not go to work after the strike began until June 18th and he came home about 3:30 that afternoon. About 1 o'clock the next morning the telephone rang and she answered the phone. She was then advised by an anonymous caller not to let her husband go back to work that morning because the C.I.O. Local 23 was trying to keep the machinists out of the plant. She was further advised by this call that if her husband did go to work she could not live in her house after they got through with it. She was also warned that she would be dragged out of her house by her hair if she let her husband go to work. The caller then asked to talk to Mr. Haines and Haines talked to him. After this conversation with the unknown caller Haines told Mrs. Haines that he intended to go to work at that time because he had been told that something would happen to him if he came out to the gate at the regular reporting time at 7 A.M. She then drove her husband to the plant, arriving there about 2 A.M. She did not take him to the gate but took him to the railroad tracks and he walked down the track to the plant. She then rushed home as quickly as possible and stood in the door with the lights off. Shortly thereafter a man appeared on the front porch and threw a rock through the bedroom window. After this Haines remained in the plant until the strike was over. Thereafter she left town for a few days and on her return she received several anonymous telephone calls—usually three or four calls every hour through the night and until she had her phone restricted against night calls. On one occasion the anonymous caller told Mrs. Haines that when Mr. Haines came out of the plant he would furnish her two telephone numbers which she would need and he gave her two phone numbers, one of which was the hospital and the other a funeral home. Mrs. Kempt testified that her husband was a stillman at Port Arthur Works and he did not go to work until July 6th and stayed in the plant then until the following Sunday. While he was away at the plant she received numerous telephone calls from anonymous callers who stated that she had better get her husband out of the plant if she knew what was good for her. These telephone calls continued during the three weeks period.

Mrs. Roy Cappadonna testified that her husband was an electrician at the Port Arthur Works and reported to work during

the entire period of the strike. About July 9th while she was sleeping in bed with her little daughter a brick was thrown through the window of the bedroom which hit her on the ankle. After this she was called on the telephone and advised that she had better keep what was going on out of the newspapers. During the course of that night a big light was flashed on the house.

During the course of the strike the appellant, through its works manager at Port Arthur Works, filed a charge against the striking Oil Workers Union with the National Labor Relations Board, charging acts of violence committed by members of that union against employees reporting for work across the picket lines. Following are the principal charges made:

"1. Engaged in mass picketing on or about June 18th, 19th, 20th, 23rd, and 24th of 1950 and at other times;

"2. Threatened employees with loss of jobs, bodily harm, and loss of life, because they were attempting to return to work on or about June 18th, 19th, and 20th and at various other times to date hereof;

"3. On or about June 19th, 1950, assaulted, beat, slugged and kicked employees causing bodily injury to them and causing a fracture of the skull of one employee, necessitating hospitalization;

"4. Threw pepper into the eyes of employees who attempted to return to work on or about June 29th, 1950;

"5. At various times between June 18th, 19th, 1950 and the date hereof, threatened wives, daughters, and other members of the employees' families with physical molestation and bodily harm if the employees returned to or remained at work;

"6. Threw rocks and other objects onto and otherwise did damage to houses of the employees on various dates between June 18th and the date hereof."

The Works Manager testified on trial that he signed and swore to the charges and all of the acts which are charged took place during the strike and were directed against employees and their families and that such employees are those that crossed picket lines to report for work.

There also was in evidence some proof of many acts of violence occurring during the strike of the Oil Workers Union against the Pure Oil Company near Port Neches some three years before the strike at The Texas Company. Numerous acts similar to the ones that are detailed above occurred there and at that time. The appellee claimants knew of these acts at the time they first refused to cross the picket lines.

The appellant argues that since there was no evidence of threats of violence directed immediately against the claimant appellees and there was no evidence of violence or threats of violence near the entrance gates at either of the plants where claimants worked, and since administrative, supervisory, office clerical, technical, confidential and Marine Department employees cross the picket lines at all three plants involved in the strike without any violence or threats being made, and that all the acts of violence at the Port Arthur Works occurred after June 19th, that the claimant appellees had no basis for their fears of safety when they refused to cross the picket lines back on April 4th when the strike began.

It appears to us that from their knowledge of what had occurred previously in strikes by the same large and powerful union in the same locality and in the same industry, and also because of developments and the serious acts of violence during this same strike, the fears of appellees were well founded. It was of small, if any, importance that no acts of violence or threats of violence had been directed at them individually because, as a matter of fact, they avoided that possibility by staying away from the picket lines. They must have felt fairly certain at the time they refused to cross the lines, when notified by the striking strategy committee that retaliation would occur if they did cross the lines, that the same things would happen to them which this record shows happened to many other workers who crossed the picket lines. We

believe that, as pointed out by the appellees in their brief, the passage of the various laws against strike threats and violence has not prevented such threats and violence from occurring, but has removed such threats and violence from the immediate area of the picket lines to other places in the community and to the homes of the workers themselves. In such instances the guilty ones are not usually identified or apprehended, since the acts usually occur at times and places away from the vicinity of the plants, where police officers are not likely to be present. Even if the perpetrators of these acts were apprehended, tried and punished by the law, the injured persons might very well and very sensibly prefer not to have themselves maimed and injured and terrorized by entering into physical combat in such a one-sided battle.

■ We think taken altogether the record made on the trial of this case abundantly supports the order and action of the Board itself in finding that the appellees refused to cross the picket lines not because of their union principles but because of well-founded fears of threats and violence to themselves and their families. The order of the Texas Employment Commission in allowing them unemployment compensation was properly upheld by the trial court.

■ The thirteenth point of the appellant is that the trial court erred in receiving in evidence over its objection testimony regarding acts of violence occurring during the Pure Oil Company strike approximately three years prior to the strike in issue in this case. The testimony complained of was about acts of violence by members of the Oil Workers Union in a strike against Pure Oil Company's refinery at Port Neches. It was by members of the same union, in the same locality, and in the same industry, as that with which we are concerned. Numerous acts of violence occurred and the claimant appellees testified that they knew about them and that such knowledge was a part of their basis for fearing that similar acts would be committed against them if they crossed the picket lines of the Oil Workers Union at appellant's plants.

We think the testimony was properly admitted, on the issue of whether the claimants' fears of violence against them were well founded. However, if this was error it was harmless, in view of the fact that there was other testimony in the record to show a basis for their fears, as is discussed above. This point is overruled.

We believe that the action of the Commission was amply supported by substantial evidence, that the action was not illegal nor capricious, and that the judgment of the trial court sustaining such action should be affirmed.

Affirmed.