**TEXAS EMPLOYMENT COMMISSION and Shamrock Oil & Gas Corporation, Appellants,**

v.

**William KRAFT et al., Appellees.**

No. 7667.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 27, 1966.

Rehearing Denied Jan. 23, 1967.

—————◆—————

Waggoner Carr, Atty. Gen., Hawthorn Phillips, First Asst. Atty. Gen., T. B. Wright, Executive Asst. Atty. Gen., H. Grady Chandler and J. H. Broadhurst, Asst. Attys. Gen., E. A. Boynton, Austin, of counsel, Underwood, Wilson, Sutton, Heare & Berry, Amarillo, for appellants.

Sam Houston Clinton, Jr., Austin, H. B. Porter, Dumas, for appellees.

NORTHCUTT, Justice.

This is an appeal by the Texas Employment Commission and the Shamrock Oil & Gas Corporation, defendants below, from a judgment of the District Court of Moore County, Texas, in a proceedings tried before the court without a jury. In the trial court the suit styled William E. Henry et al., No. 4484, in the court below in which Travis Truelock later intervened was consolidated with a suit in which William Kraft was plaintiff and which was numbered 4476 on the trial court docket. In each of these actions the Texas Employment Commission and Shamrock Oil & Gas Corporation were the defendants.

In each of such actions so consolidated, the respective plaintiffs and intervenor appealed to the district court from decisions of the Texas Employment Commission holding that the respective plaintiffs and intervenor were not entitled to unemployment compensation benefits under the Texas Unemployment Compensation Act. The judgment of the trial court reversed each of the decisions of the Texas Employment Commission and held that each of the plaintiffs and the intervenor are, contrary to the decision of the Texas Employment Commission, entitled to receive unemployment compensation benefits.

The complainants, plaintiffs, in the trial court will hereafter be referred to as appellees and Shamrock Oil & Gas Corporation and Texas Employment Commission, defendants, will be referred to as appellants.

This appeal involves the proper construction of the Texas Unemployment Compensation Act. We think the real issue here is whether the Commission erred when it determined the appellees were disqualified to receive benefits under Subsection (d), Article 5221b–3, Vernon's Ann.Tex.Civ.St. That article provides that an individual *shall* (emphasis ours) be disqualified for any benefit period with respect to which the Commission finds that his total or partial unemployment is due to the claimant's stoppage of work because of a labor dispute at the factory, establishment or other premises at which he is or was last employed. The Commission found that the appellees were disqualified to receive benefits under the act because their total and partial unemployment was due to the appellees' stoppage of work because of a labor dispute at the place where they were last employed. Under the matter here involved, we think it is clear that the reference to the place they were last employed has reference to the work for Shamrock Oil & Gas Corporation. In other words, the suit in the district court was brought to test the validity of the Commission's order and to see if there was substantial evidence to support the ruling of the Commission.

Appellees were members of the union here involved and Shamrock Oil & Gas Corporation recognized and dealt with the union. Prior to August 9, 1964, negotiations were being carried on between Shamrock and the union involving wages and working conditions which negotiations ended in an impasse and the termination of all contracts between the union and Shamrock when a strike was commenced by the union on August 9, 1964. Picketing of Shamrock's

facilities was commenced on August 9, 1964. The signs carried by the pickets stated in substance that the union was on strike against Shamrock Oil & Gas Corporation.

Each employee in the bargaining units was advised by letter dated August 9, 1964, signed by the employer's president, that the company had the right to continue the operation of its facilities and properties even during the progress of a strike and that the company would so continue the full operation of its plant and at 9:00 a.m. on Wednesday, August 12, 1964, would begin employment on a permanent basis new personnel to replace striking employees. Such letter further advised all employees that any employee then on strike who desired to return to work prior to his replacement was so privileged but under no compulsion from the company to do so. The strike so begun on August 9, 1964, was an economic strike involving wages and working conditions and not an unfair labor practice strike resulting from unlawful conduct of the employer.

Immediately after August 9, 1964, the employer continued to operate its plants and facilities through supervisors, non-bargaining unit personnel, and employees who did not strike and, after August 12, 1964, also by newly hired replacements for striking employees and striking employees who returned to work. In a negotiating session on September 30, 1964, the union submitted a written proposal for settling the strike which proposal involved the return to work of all striking employees. The union's proposal was rejected by the company, which took the position that newly hired employees hired as permanent replacements, would not be laid off to make room for strikers to return to work. In rejecting the union's proposal, the company reported to the Union Negotiating Committee the company had hired a large number of replacements and did not have available jobs for all strikers without discharging permanent replacements, which the company was not willing to do since the replacements had

been employed on a permanent basis and many had given up permanent jobs to go to work for Shamrock. Between August 9, 1964, and October 5, 1964, the employer hired approximately 212 new employees as permanent replacements in the bargaining units involved. Just before October 5, 1964, the number of employees who did not go on strike or who went on strike but returned to work before October 5, 1964, totaled approximately 83. The company kept the negotiating committee informed as to the number of replacements that were employed first reporting 60, next 105 and then over 200. On or about October 5, 1964, and a day or so thereafter, some 100 strikers and others thereafter before October 19, 1964, personally appeared at or in one or the other of the employer facilities and offered to return to work. Between October 5, 1964, and October 19, 1964, Shamrock took back or reinstated approximately 105 to 110 strikers.

By October 19, 1964, every existing job in the units represented by the union had been filled except one job of a welder first-class because there was no applicant qualified to do the work of such qualifications. Each of the striking employees who appeared at one of the facilities of the employer and requested reinstatement crossed the picket lines around such facilities with the permission of the union. The picket lines around property of the employer were continuously maintained from the beginning of the strike on August 9, 1964, until the time of hearing in the district court in December 1965. Though the picket signs were changed on October 19, 1964, to claim that Shamrock employees were "locked out."

At the hearing in December 1965 it was stipulated by the plaintiffs' counsel that a labor dispute between the union and employer continued to exist to such date.

Shortly prior to October 5, 1964, top-level meetings of high level union officials

were held in which it was concluded that the strikers could and would be told they could seek reinstatement that they could cross the picket line and a committee was appointed to notify the people to that effect. The striking employees were granted written permission by the union to cross the picket line which was being maintained at that time. Striking employees were instructed to return to the union hall after seeking reinstatement and report back what had happened. The majority of the striking employees offered themselves for re-employment individually but those who did not were covered by blanket letter written by Mr. Thornbury, the international representative. There was other testimony concerning the actions of appellees and their participation in the strike even up to the time of the hearing in the district court.

■ We do not believe the case of Texas Employment Commission v. Hodson, 346 S.W.2d 665 (Tex.Civ.App.—Waco, 1961) applies herein. The facts in that case are different from the facts here involved. There the employee voluntarily crossed the picket line of his union and unconditionally offered to go back to work but was told there was no work for him because the employer had replaced him and filled his job. There is nothing in that case to show that the appellee participated further in the union. It is stated in Subsection (d), Article 5221b-3: "[P]rovided that this subsection shall not apply if it is shown to the satisfaction of the Commission that: (1) He is not participating in or financing or directly interested in the labor dispute". Appellees herein did not show to the satisfaction of the Commission that they were not participating in or directly interested in the labor dispute. Appellees crossed the picket line with the consent of the union and were to report back to the union, and continued to take part in the picketing. We think the evidence clearly shows in this case that appellees were participating and directly interested in the labor dispute

which still existed at the time of the trial in the district court.

■ It is now well established in this state that an appeal from the orders of an administrative agency the decision of the agency will be sustained if it is reasonably supported by substantial evidence introduced in the trial court. Hawkins v. Texas Co., 146 Tex. 511, 209 S.W.2d 338 (1948); Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424 (1946); Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420 (1946); Todd Shipyards Corp. v. Texas Employment Commission, 245 S.W.2d 371 (Tex.Civ.App.—Galveston, 1951, writ ref'd nre).

See Texas Employment Commission v. Camacho, 394 S.W.2d 35 (Tex.Civ.App.—Dallas, 1965, no writ) as follows:

"We agree with appellants that this finding and the judgment are erroneous. Proper application of the substantial evidence rule precludes the courts from substituting their findings or conclusions for those of an administrative agency. Davis v. City of Lubbock, 160 Tex. 38, 326 S.W.2d 699, 714. All the courts may do is to adjudge the reasonableness of the agency's action on the basis of the evidence admitted in the judicial proceeding. The issue is purely one of law, for 'the legal test of the reasonableness of an order of an administrative agency is whether it is reasonably supported by substantial evidence and not whether it is supported by a preponderance of the evidence.' Southern Canal Co. v. State Board of Water Eng., 159 Tex. 227, 318 S.W.2d 619, 623; Texas Company v. Texas Employment Commission, Tex.Civ.App., 261 S.W.2d 178, 183, wr. ref. n. r. e.; Railroad. Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, 1029; Jones v. Marsh, 148 Tex. 362, 224 S.W.2d 198; Todd Shipyards Corp v. Texas Employment Commission, Tex.Civ.App., 245 S.W.2d 371, wr. ref. n. r. e.; Board of

Fireman's Relief & Retirement Fund, etc. v. Marks, 150 Tex. 433, 242 S.W.2d 181, 27 A.L.R.2d 965."

We think the rule in these kind of cases has been well stated and determined in the case of Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 at 1029 (1942) as follows:

"Much of the confusion that exists concerning the effect to be given to the so-called findings of fact by an administrative agency, upon a contest of an order of such agency in court, arises from the failure to take into consideration the kind of order issued by the agency, and the character of contest that is being made thereon. As above indicated, our statutes do not provide for the making of any findings of fact by an administrative agency. Nevertheless, when the validity of an order of such an agency is contested in court, certain presumptions are indulged in favor of the validity of such order in some instances. If the matter covered by the order is one committed to the agency by the Legislature, and involves the exercise of its sound judgment and discretion in the administration of the matter so committed to it, the court will not undertake to put itself in the position of the agency, and determine the wisdom or advisability of the particular ruling or order in question, but will sustain the action of the agency so long as its conclusions are reasonably supported by substantial evidence. This is so because, since the Legislature has seen fit to vest the authority to exercise sound judgment and discretion in the particular matter in the administrative agency, courts will not undertake to usurp the powers committed to the agency, and to exercise the agency's judgment and discretion for it. For example, in contesting an order of a commissioners' court fixing a tax rate, or an order of a school board concerning the management of schools, the court will not put itself in the position of the administrative agency for the purpose of determining whether or not the action was wise. Wright v. Allen, Tex.Civ.App., 257 S.W. 980, par. 4, writ refused; Young County Board of School Trustees v. Bailey, Tex. Civ.App., 61 S.W.2d 130, par. 2, writ refused. In such a case the issue is not whether or not the agency came to the proper fact conclusion on the basis of conflicting evidence, but whether or not it acted arbitrarily and without regard to the facts. Hence it is generally recognized that where the order of the agency under attack involves the exercise of the sound judgment and discretion of the agency in a matter committed to it by the Legislature, the court will sustain the order if the action of the agency in reaching such conclusion is reasonably supported by substantial evidence. This does not mean that a mere scintilla of evidence will suffice, nor does it mean that the court is bound to select the testimony of one side, with absolute blindness to that introduced by the other. After all, the court is to render justice in the case. The record is to be considered as a whole, and it is for the court to determine what constitutes substantial evidence. The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court. If the evidence as a whole is such that reasonable minds could not have reached the conclusion that the agency must have reached in order to justify its action, then the order must be set aside.".

■ Where the legislature has granted to the administrative body the discretionary power the court will not substitute its own discretion for that of the administrator and if the actions of the administrative agency are reasonably supported by substantial evidence introduced before the court, the court should affirm the administrative agency's actions. Texas Co. v.

Texas Employment Commission, 261 S.W. 2d 178 (Tex.Civ.App.—Beaumont, 1953, writ ref'd nre) and the many cases there cited.

We are of the opinion, and so hold, that the trial court erred in setting aside the decision of the Texas Employment Commission holding that the appellees were disqualified for employment benefits since such decision was reasonably supported by substantial evidence.

Judgment of the trial court is reversed and rendered.

DENTON, Chief Justice (dissenting).

I respectfully dissent. The result reached by the majority is in direct conflict with Texas Employment Commission v. Hodson (Tex.Civ.App.) 346 S.W.2d 665 (Ref. N.R.E.). In my opinion the two cases are not distinguishable. In *Hodson* the court upheld the trial court's judgment which set aside the Employment Commission's order denying benefits to a striking claimant. In so holding, the court held:

"When appellee crossed his own picket line during the strike and was refused employment because there was no work available due to his job having been filled by another, his unemployment was no longer 'because of a labor dispute at the factory'; it was because there was no job for him. Resort to the escape clauses, subsection (d) (1) and (2) is not required, since the basic disqualification did not then exist. A new cause of involuntary unemployment had then displaced the original disqualifying cause."

The result of that case was approved by the Supreme Court. In my opinion it is incumbent upon this court to follow the ruling of the *Hodson* case.

I would affirm the judgment of the trial court.